2008 UT 6

**John and Olga GARDNER, et al., Plaintiffs and Appellants,**

v.

**BOARD OF COUNTY COMMISSIONERS OF WASATCH COUNTY, et al., Defendants and Appellees.**

**No. 20051110.**

Supreme Court of Utah.

Feb. 1, 2008.

Gordon Duval, Brian Haws, Gregory Hansen, American Fork, for plaintiffs.

Barton H. Kunz II, Craig V. Wentz, Salt Lake City, for defendants.

DURHAM, Chief Justice:

## INTRODUCTION

¶ 1 A group of property owners (the Landowners) in the Wasatch County subdivision known as Canyon Meadows sued Wasatch County (the County) for various claims resulting from the impact of two County ordinances that temporarily restricted development in Canyon Meadows. The events that took place leading to and resulting from the restrictive ordinances are outlined below.

## BACKGROUND

### I. FACTUAL BACKGROUND

¶ 2 Canyon Meadows is a residential subdivision located in Provo Canyon. Between 1981 and 1985, more than eighty lots were approved for building. In 1993, New Canyon Meadows LLC (NCM) acquired the unsold lots in Canyon Meadows and the surrounding unplatted areas included in the original master plan of the Canyon Meadows area and proposed a large residential project.

¶ 3 In May 1994, following a geological study undertaken in connection with an anticipated highway expansion in the area, the Utah Department of Transportation (UDOT) warned Robert Mathis, the Wasatch County Planner, that "[t]here is substantial movement in the [Hoover S]lide, and the depth of movement is such that it is not likely that the slide can be stabilized." UDOT also expressed concern that an increase in the number of septic systems in the area could "pose a serious impact to the Hoover Slide." A majority of the residential land at issue in this case sits on the Hoover Slide, and the then-existing and anticipated homes in the area utilized septic systems for waste removal.

¶ 4 In November 1995, the Utah Geological Survey (UGS) reported on its review of an engineering study of the area conducted by AGRA Earth & Environmental, Inc. (AGRA).[1] UGS agreed with "AGRA's con-cerns regarding possible slope destabilization if care is not taken during future development." In a June 1996 follow-up report, UGS informed Phil Wright, the Wasatch County Health Director, that the soil on which Canyon Meadows was located was "derived from the Pennsylvanian–Mississippian Manning Canyon Shale," which was identified as a "problem" geologic unit because its expansive soil and rock can interfere with proper functioning of septic tank soil absorption systems. If the potential problems materialize, the report continued, "soil quickly becomes impermeable and [ ] septic systems clog and fail, causing wastewater to flow to the surface creating a health hazard."

¶ 5 The Landowners opposed the NCM development and presented the County with a letter highlighting the potentially severe consequences of such large-scale development. The letter noted that the area was "very fragile," and that the problems identified in the various studies could affect proper septic system functioning. The Landowners expressed concern about a potential "catastrophic failure of the septic drain fields" and recognized the fact that a majority of the lots in Canyon Meadows failed percolation tests performed by engineering firms. The Landowners worried that additional development might disturb the soil's equilibrium and possibly "trigger motion of the ancient mud flow." The Landowners also explicitly conceded that the Canyon Meadows area is "ecologically sensitive."

¶ 6 In the fall of 1996, Mr. Mathis met with Victor Orvis and Dee Olsen, representatives of the Canyon Meadows' Home Owners Association, to address some of the Landowners' collective concerns. During one such meeting in the summer of 1997, Mr. Mathis allegedly became hostile and "began screaming and making unfounded accusations against" Mr. Orvis and Mr. Olsen.

¶ 7 Several of the Canyon Meadows lots had been improved when, on January 13, 1997, the County enacted Ordinance 97–1, a six-month temporary zoning regulation, restricting the approval process for further development in the area. Ordinance 97–1

---

1. NCM commissioned the AGRA study.

never appeared on the County's published agenda but was published in the local newspaper.

¶ 8 Ordinance 97–1 prohibited the acceptance or approval of applications for building permits that required septic systems and also mandated additional studies of slope stability and septic system suitability in Canyon Meadows and in the area of the proposed NCM development. The County based the ordinance on findings from the various geological studies detailed above and explained that because "County officials have legitimate and serious concerns that the hydrology and geology of the area ... may not be suitable for additional septic tanks or the continued use of existing septic tanks," it determined "to temporarily suspend the sale of lots and the issuance of building permits ... until a comprehensive study can be done to determine the safety of the geological features of the area, and to determine the suitability of the area of [sic] continued development on individual septic tanks."

¶ 9 Pursuant to Ordinance 97–1, the County hired Applied Geotechnical Engineering Consultants, Inc. (AGEC) to conduct a septic system suitability study. AGEC drilled forty wells and installed monitoring devices on the Landowners' property in order to perform the groundwater studies. The resulting AGEC report, which was reviewed and accepted by UGS, concluded that most of the Canyon Meadows subdivision was unsuitable for septic tank soil absorption systems because of shallow groundwater and warned of potential health risks if such systems were used. With respect to landslide issues, AGEC reviewed information from earlier geotechnical studies and recommended additional studies "to provide a better estimate of the risk of slope failure." UGS concluded that AGEC's opinion that the slide was "marginally stable" was "not overly conservative," and UGS concurred with AGEC's recommendation that an "additional detailed geotechnical-engineering field investigation [was] needed to determine whether the subdivision [was] suitable for additional development."

¶ 10 After Ordinance 97–1 expired, the County proposed Ordinance 97–6. The county commission held a public hearing to discuss the ordinance and the overall status of the area. A representative from AGEC attended the hearing and reported on its concerns related to septic system functionability and slope stability. The Landowners expressed opposing views. The commission adopted Ordinance 97–6, but, as explained below, it never became effective. When it was enacted, the county commission agreed to meet for additional discussion. When the commission met less than a month later, it learned that the Landowners wanted to select their own engineers to complete the recommended studies and concluded that if individual lot owners could establish that their lots were sufficiently stable, they would be issued building permits. The commission revised Ordinance 97–6 to this effect and renumbered it as Ordinance 97–13. Ordinance 97–13 also narrowed the area of the restriction so as to exclude some of the properties that had been restricted under Ordinance 97–1. According to the Landowners, Ordinance 97–13 covered the Canyon Meadows subdivision but inexplicably excluded the areas NCM sought to develop. Ordinance 97–13 became effective when it was published on November 12, 1997.

¶ 11 Pursuant to Ordinance 97–13, the Landowners retained their own geotechnical engineers to perform slope stability testing, for which their homeowners association paid over $50,000. The Landowners alleged a number of hurdles encountered in obtaining building permits during the course of the restrictive periods. For example, Tom Hicken, an individual certified to do percolation testing in Wasatch County, testified in an affidavit that the county health department imposed testing requirement criteria on Canyon Meadows that were not required in other parts of the county. Mr. Orvis explained, in his February 26, 2001 affidavit testimony, that it was difficult to find someone willing to run certain tests on the area because working with Canyon Meadows could harm a tester's working relationship with the County. Furthermore, according to the Landowners, the County violated Utah Administrative Code rule 317–4–5.4A (2007) when it directed the health department to perform septic system viability tests at a depth of four feet ten

inches when the septic systems in Canyon Meadows were installed at a depth of ten inches. Rule 317–4–5.4A requires percolation system testing to be performed "at points and elevations selected as typical of the area in which the absorption systems will be constructed." Finally, the Landowners explained that AGEC, under the direction of the County, installed 40 groundwater monitoring wells on their properties without permission and repeatedly entered their properties, also without permission, to monitor the water levels in the wells.

¶ 12 On November 12, 1998, the County approved the first building permit following the restrictive periods described above and subsequently issued several additional building permits in the Canyon Meadows subdivision. In December 1998, AGEC submitted a stability report noting average movement on the slide below the development and concluded that Canyon Meadows could be developed as intended but with precautions.

## II.   PROCEDURAL BACKGROUND

¶ 13 The Landowners filed two separate lawsuits in Wasatch County in 1997. The first suit was filed against the Board of County Commissioners (the Board) and Robert Mathis, the County Planner. The second suit was filed against the County. The suit against the Board was transferred to Utah County in May 1999. In March 2000, the suit against the County was consolidated into a third suit, filed by the Landowners in 1999 against the Board, the County, Mr. Mathis, County Health Director Phil Wright, and other County employees. In December 2000, the second and third suits were consolidated into the first suit.

¶ 14 The parties to the consolidated suit filed cross-motions for summary judgment. After argument, Judge James R. Taylor issued a memorandum decision dismissing all but four claims of the Landowners. The parties filed cross-motions that resulted in Judge Taylor narrowing the scope of the remaining four claims.

¶ 15 Subsequently, Judge Anthony W. Schofield, to whom the case assignment had rotated, granted the County's motion to compel the Landowners to answer certain interrogatories to which they had objected. When the County received answers from certain individuals who had not previously been identified by name as plaintiffs (the complaint names several "John Doe" plaintiffs), Judge Schofield also granted the County's motion to limit the plaintiffs to those named in the complaint.

¶ 16 The County moved for summary judgment on the remaining claims. After briefing and preparation for hearing, counsel for the Landowners, at the beginning of the hearing, unexpectedly requested that the court grant the County's motion for summary judgment on the remaining claims and dismiss them. After some discussion and agreement from the County, Judge Schofield granted the request. Shortly thereafter, Judge Schofield granted the County's subsequent motion for an award of attorney fees and costs incurred in preparation for defending the dismissed claims. The Landowners appealed the entire case to us. We have jurisdiction pursuant to Utah Code section 78–2–2(3)(j) (2002).

## STANDARD OF REVIEW

¶ 17 Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Utah R. Civ. P. 56(c). "In reviewing a grant of summary judgement, we do not defer to the legal conclusions of the district court, but review them for correctness." *Springville Citizens for a Better Cmty. v. City of Springville*, 1999 UT 25, ¶ 22, 979 P.2d 332. This standard is appropriate for Parts I through VII of this opinion. With respect to Parts VIII, IX, and X, the appropriate standard of review is abuse of discretion, as noted in our discussion.

## ANALYSIS

¶ 18 On appeal, the Landowners request that we reverse the district court's grant of summary judgment or dismissal of a variety of claims. Because there are many claims at issue, we address each claim individually.

## I. THE LANDOWNERS' CHALLENGE TO ORDINANCE 97–1 WAS UNTIMELY

■ ¶ 19 The Landowners argue that Ordinance 97–1, a temporary zoning regulation enacted under Utah Code section 17–27–404 (Supp.1997),[2] was enacted in violation of the County Land Use, Development, and Management Act (CLUDMA). We conclude that the County's failure to include Ordinance 97–1 on the agenda for its regularly scheduled January 13, 1997 meeting actually violated a requirement of Utah Code section 52–4–6(2) (2002)[3] of the Open and Public Meetings Act (OPMA), which states that a "public body shall give not less than 24 hours' public notice of the agenda, date, time and place of each of its meetings."[4]

¶ 20 The Landowners' challenge to Ordinance 97–1 under section 52–4–6 was not timely. Final actions taken in violation of section 52–4–6 are voidable, but a challenge seeking to void the action must be brought within ninety days of the violation. Utah Code Ann. § 52–4–8 (2002).[5] The County approved Ordinance 97–1 at its January 13, 1997 meeting, but the Landowners did not challenge it until September 1997, well after the ninety-day time limit had expired. Thus, the district court did not err in dismissing the Landowners' claim as untimely.

## II. ORDINANCE 97–13 WAS NOT ILLEGAL, ARBITRARY, OR CAPRICIOUS; WAS PROPERLY APPROVED; AND DID NOT IMPOSE AN ILLEGAL FEE ON THE LANDOWNERS

¶ 21 Ordinances 97–1 and 97–13 were passed pursuant to Utah Code section 17–27–404 (Supp.1997), which permitted a county legislative body to "enact an ordinance establishing a temporary zoning regulation ... if the legislative body makes a finding of compelling, countervailing public interest." If a challenge to a county's land use decision exhausts all administrative remedies and is timely made, a reviewing district court must "determine only whether or not the decision ... is arbitrary, capricious, or illegal." Utah Code Ann. § 17–27a–801 (Supp.2007). Because, as discussed in the prior section, the Landowners' challenge to Ordinance 97–1 was untimely, we discuss only Ordinance 97–13 in this section.

■ ¶ 22 The district court found that the Landowners' challenge to Ordinance 97–13 failed as a matter of law because "the undisputed evidence is that there has been a legitimate concern over the geology of the devel-

---

2. Unless otherwise noted, this opinion cites to the current version of the applicable statutes. Where necessary because of a subsequent substantive change, as is the case here, we cite to the version in effect at the time of the alleged violation. The current version of section 404 is found at Utah Code section 17–27a–504 (2005).

3. The current version of section 52–4–6 is found at Utah Code section 52–4–202(1) (2007).

4. While our decision on the timeliness violation relates to Utah Code section 52–4–8, we note that the district court concluded that there was a timeliness violation of Utah Code section 17–27a–801 (Supp.2007), which is the statute addressed by each party in its brief on appeal. The result is the same under either statute.

   The Landowners originally brought their claim under section 17–27a–801, which allows persons adversely affected by a county's final land use decision to file a challenge in a district court. Section 801 is part of the County Land Use, Development, and Management Act (CLUDMA). The purpose of CLUDMA is to "provide for the health, safety, and welfare ... of each county," and it grants counties authority to enact related ordinances and resolutions. Utah Code Ann. § 17–27a–102(1)(a) (Supp.2007). While the content of Ordinance 97–1 falls within CLUDMA's authority, the challenge to Ordinance 97–1 actually arose from the County's violation of OPMA, and thus we have undertaken our analysis within that act. Nevertheless, because section 801 requires a petition for review to be made within thirty days of the decision, the Landowners' challenge was also untimely under section 801.

   On appeal to this court, the Landowners challenged Ordinance 97–1 under Utah Code section 17–27a–802 (2005), recognizing that section 802 challenges are not limited in time. Without addressing the fact that a challenge under section 802 was not raised below and, therefore, was not preserved and cannot properly come before us on appeal, we note that section 802 provides a means to challenge procedural violations of CLUDMA. Section 802 does not apply here, in our view, because the challenge arose from a violation of OPMA and not from a procedural violation of CLUDMA.

5. The current version of section 52–4–8 is found at Utah Code section 52–4–302(2) (2007).

opment area for a substantial period of time," and "[t]here is nothing in the pleadings or the evidence before this Court by way of affidavit or other submission that would lead this Court to conclude that the County enactment of Ordinance 97–13 was an arbitrary or capricious reaction to the long-standing geologic concerns." Given the number and depth of the geological studies expressing concern over slope stability and septic system suitability in the area, together with the Landowners' own opposition to new development and agreement that the area was "ecologically sensitive," we agree with and affirm the decision of the district court.

¶ 23 With respect to the Landowners' remaining contentions concerning the validity of Ordinance 97–13, we also affirm the district court's decisions. The Landowners contend that Ordinance 97–13 was invalid because it was not submitted to the planning commission for approval before consideration by the county commission.[6] The district court held that "temporary regulations created under [section 404] are subject only to the requirements of part 404 and therefore [Ordinance 97–13] need not have been submitted to the planning commission." We agree.

¶ 24 The Landowners contend further that Ordinance 97–13 illegally imposed a fee in violation of Utah Code section 17–27–404(1)(c) (Supp.1997). The temporary restriction on the issuance of building permits included, at the request of the Landowners, an exception allowing individual property owners in the affected area to obtain a building permit upon the successful completion of a slope stability study. The Landowners contend that the cost of the slope stability study constituted an illegal fee. We disagree. As recognized by the district court, the option to establish, on a case-by-case, voluntary basis, whether an individual's land is suitable for construction does not equate to the imposition of an impact fee.

¶ 25 Accordingly, we affirm the district court's conclusions that Ordinance 97–13 did not need to be submitted to the planning commission for prior approval, did not impose an illegal fee on the Landowners, and was not illegal, arbitrary, or capricious.

III. THE LANDOWNERS' FEDERAL REGULATORY CLAIMS ARE NOT RIPE; THEIR PHYSICAL TAKINGS CLAIM WAS WAIVED

A. *Because the Landowners Failed to Allege and Plead to Its Conclusion a State Law Inverse Condemnation Claim Pursuant to Article I, Section 22 of the Utah Constitution, We Will Not Consider Their Federal Fifth Amendment Takings Claim*

¶ 26 The County filed a Motion for Summary Disposition on this issue, arguing that a federal takings claim only ripens after state takings remedies have proven inadequate. Under this argument, the County suggests that because the Landowners have not sought state takings remedies pursuant to article 1, section 22 of the Utah Constitution, their federal regulatory takings claim is not ripe. We agree.

¶ 27 The United States Supreme Court explained in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City* that because the Fifth Amendment to the United States Constitution prohibits the taking of property without just compensation, "if the government has provided an adequate process for obtaining compensation, and if resort to that process [yields] just compensation, then the property owner has no claim against the Government for a taking." 473 U.S. 172, 194, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985) (internal quotation marks omitted) (alteration in original). Thus, "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the

6. At the time Ordinance 97–13 was adopted, Utah Code section 17–27–404 read, "A county legislative body may, *without a public hearing*, enact an ordinance establishing a temporary zoning regulation for any part or all of the area within a county if: the legislative body makes a finding of compelling, countervailing public interest ...." (emphasis added). The current ver-

sion of this statute, Utah Code section 17–27a–504 (2005), reads, "A county legislative body may, *without prior consideration of or recommendation from the planning commission*, enact an ordinance ...." (emphasis added). The current version is not the applicable version for the resolution of this dispute because it was not effective when the ordinance was adopted.

Just Compensation Clause until it has used the procedure and been denied just compensation." *Id.* at 195, 105 S.Ct. 3108. Utah law provides such a procedure.

■ ¶ 28 Article I, section 22 of the Utah Constitution states, "Private property shall not be taken or damaged for public use without just compensation." If private property is taken or damaged for public use absent formal use of Utah's eminent domain power, a "property owner may bring an inverse condemnation action under article I, section 22 to recover the value of the property." *Farmers New World Life Ins. Co. v. Bountiful City,* 803 P.2d 1241, 1243 (Utah 1990).

■ ¶ 29 Therefore, before bringing a federal takings claim, the Landowners must have pursued their state takings claim to an unsuccessful conclusion. They have not done so. Although the Landowners have claimed "inverse condemnation" a few times in the history of this case, they did not do so in their Amended Complaint with regard to their regulatory takings claim, and they have never done so pursuant to article 1, section 22.[7] " 'Unless and until plaintiffs avail themselves of [the inverse condemnation] remedy, their takings claim will remain unripe.' " *Patterson v. Am. Fork City,* 2003 UT 7, ¶ 35, 67 P.3d 466 (quoting *Bell v. Am. Fork City,* No. 98–4215, 201 F.3d 447, ——, 1999 WL 1079601 at *2,1999 U.S.App. LEXIS 30734 at *7 (10th Cir. Nov. 30, 1999) (alteration in original) ). Because the Landowners have not pursued a state inverse condemnation claim to an unsuccessful conclusion, their federal takings claim is unripe.

### B. The Claim That Physical Taking Occurred Was Waived

■ ¶ 30 Under the direction of the County, AGEC installed forty groundwater monitoring wells on the Landowners' properties. Both the installation of the wells and the regular monitoring of them occurred without the Landowners' permission to enter the properties. The Landowners claim that this invasion constituted a physical taking of their properties that entitles them to compensation under the Fifth Amendment of the U.S. Constitution. This claim was not preserved for appeal.

¶ 31 The Landowners' Amended Complaint before the district court claimed that the County committed trespass by drilling wells and periodically inspecting the groundwater levels in them. The district court dismissed the trespass claim after concluding that declaratory relief, which was the relief sought by the Landowners on this claim, was "not available under the law for the tort of trespass." The Landowners did not appeal the district court decision on their trespass claim. Instead they argue in their brief before us that the installation and monitoring of water in the wells amounted to a physical taking.[8]

■ ¶ 32 Issues not raised before the district court are normally waived and cannot be raised for the first time on appeal. *See Tschaggeny v. Milbank Ins. Co.,* 2007 UT 37, ¶ 22, 163 P.3d 615 ("[B]y not allowing the trial judge an adequate opportunity to consider the issues, [the plaintiff] waived the right to raise the issue on appeal."). The Landowners did not appeal the decision of the district court with respect to their trespass claim; they simply presented us with their new physical takings claim. Because the Landowners did not present that claim below, the claim is deemed waived and we will not address it for the first time on appeal.

---

7. The Landowners point out that they made reference to the Utah Constitution in their Memorandum in Opposition to Wasatch County's Amended Motion for Summary Judgment. This is true with respect to their physical takings argument, but not with respect to their regulatory takings argument. More importantly, a motion is not the proper place to raise a new claim or theory for recovery. *See Holmes Dev., LLC v. Cook,* 2002 UT 38, ¶ 31, 48 P.3d 895. In their Amended Complaint, the Landowners brought their inverse condemnation cause of action "under the Fifth and Fourteenth Amendments" to the United States Constitution.

8. We note that the Landowners argued that a physical taking occurred in their Memorandum In Opposition To Wasatch County's Amended Motion for Summary Judgment before the district court. This is insufficient for preservation purposes. A specific takings claim must have been asserted in the Landowners' Amended Complaint in order to properly come before us on appeal.

IV. ORDINANCES 97–1 AND 97–13 DID NOT VIOLATE THE LANDOWNERS' FEDERAL SUBSTANTIVE DUE PROCESS RIGHTS, BUT MAY HAVE VIOLATED THEIR FEDERAL EQUAL PROTECTION RIGHTS

¶ 33 When a fundamental right is not at issue, a statute will not violate substantive due process if it is rationally related to a legitimate state interest. *See Judd v. Drezga,* 2004 UT 91, ¶ 30, 103 P.3d 135 ("Generally, we apply a rational basis test in substantive due process cases."); *Condemarin v. Univ. Hosp.,* 775 P.2d 348, 358–59 (Utah 1989). Ordinance 97–1 and Ordinance 97–13 were rationally related to a legitimate state interest, namely, ensuring the safety of development in the Canyon Meadows area. Both ordinances mandated geological studies designed to determine whether the slopes in the area were stable enough for construction and whether the area was suitable for septic tanks. Because the test results indicated that the area was safe for development, the County resumed the issuance of building permits to Canyon Meadows applicants. The district court concluded, and we agree, that Ordinances 97–1 and 97–13 were rationally related to resolving the County's legitimate concerns and therefore did not violate the Landowners' federal substantive due process rights.

¶ 34 With respect to the Landowners' equal protection claim, however, we do not believe the district court's holding was supported by the record. Like the other claims in this case, the equal protection claim was dismissed by the district court on summary judgment. "[W]hen an appellate court reviews a district court's grant of summary judgment, the facts and all reasonable inferences drawn therefrom [are viewed] in the light most favorable to the nonmoving party." *Massey v. Griffiths,* 2007 UT 10, ¶ 8, 152 P.3d 312 (internal quotation marks omitted).

¶ 35 Ordinance 97–1 prohibited "acceptance or approval of applications for building permits ... in the Canyon Meadows area" and also "acceptance of applications for subdivision approvals on properties adjacent to the Canyon Meadows subdivision," which was understood to mean the NCM development.

Ordinance 97–13 continued the prohibition of "acceptance or approval of applications for building permits ... in the Canyon Meadows area," but did not prohibit acceptance of applications for subdivision approval on adjacent properties.

¶ 36 Landowner Victor Orvis stated in his February 26, 2001 affidavit that Ordinance 97–13 "purported to be a continuation of Ordinance 97–1, but in actuality it reduced the area covered by [Ordinance 97–1] ... to an area limited almost exclusively to the platted areas of the subdivision. Illogically, areas directly adjacent to and below the subdivision were not restricted by [Ordinance 97–13]." Mr. Orvis further alleged that the restrictions placed on Canyon Meadows were part of an "avalanche of policies and regulations" placed on Canyon Meadows because "Bob Mathis and Phil Wright and the county commission took personal offense to [his and fellow landowner and former Canyon Meadows Home Owners Association president Dee Olsen's] inquiries." Significantly, the County offered no explanation for reducing the area affected by Ordinance 97–13.

¶ 37 Another indication of disparate treatment with no rational basis is found in Tom Hicken's affidavit testimony wherein he explained that, in his experience of performing percolation tests in Wasatch County, the County "health department is much more stringent with their percolation tests in Canyon Meadows than they are anywhere else in the county." He also testified that County officials appeared to be suspicious about his testing results only in connection with work performed in Canyon Meadows. Additionally, Mr. Orvis explained in his affidavit that it was difficult to find someone willing to provide services in the percolation testing process in Canyon Meadows because those testers that made their living in Wasatch County "fear[ed] that working for Canyon Meadows would harm their working relationship with county officials."

¶ 38 Equal protection of the law requires that similarly situated persons be treated alike. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). A person claiming

that her equal protection rights have been violated must demonstrate that she was treated differently than another person similarly situated and that the unequal treatment was based upon an impermissible consideration, such as race, or that the selective treatment resulted from a malicious or bad faith intent. In this case, there was evidence of dissimilar treatment and an allegation, with some evidentiary support, of malicious or bad faith intent on the part of county officials.

■ ¶ 39 When the evidence is viewed in the light most favorable to the Landowners, summary judgment was not appropriate for this claim. An equal protection claim that, as here, does not involve a fundamental right or a suspect class is subject only to rational basis review. *See Mountain Fuel Supply Co. v. Salt Lake City Corp.*, 752 P.2d 884, 888 (Utah 1988); *see also State v. Holm*, 2006 UT 31, ¶ 99, 137 P.3d 726 ("Where no suspect classification or violation of a fundamental right is involved, a difference in treatment need be only rationally related to a valid public purpose to withstand equal protection scrutiny." (internal quotation marks omitted)). There is no fundamental right or suspect class involved in this case, so rational basis review is appropriate. Despite the fact that the rational basis test requires a relatively low level of justification for the alleged unequal treatment, we cannot, with the information found in the record, affirm the decision of the district court. Given the change in the geographic scope of the restrictions of Ordinance 97–13 compared to those of Ordinance 97–1, the fact that the County never offered any reason for the change, and the other claims of disparate treatment and bad faith motives with respect to testing standards in Canyon Meadows, we are compelled to remand this issue to the district court to determine whether Ordinance 97–13 violated the Landowners' equal protection rights.

## V. WASATCH COUNTY RESOLUTION 99–11 DOES NOT INFRINGE UPON THE LANDOWNERS' FIRST AMENDMENT RIGHTS

■ ¶ 40 Wasatch County Resolution 99–11 restricts county elected officials, department heads, and certain county employees from communicating with a person, group, or organization pursuing litigation against the county in "matters related to the pending litigation." The resolution instructs county workers to refer the litigant to the County attorney's office, who will determine whether and how to respond to the communications related to the pending litigation. Such a resolution does not violate the Landowners' First Amendment right to freedom of speech or right to petition the government for redress.

¶ 41 We agree with the district court's finding that "[t]he county legislators [ ] merely assigned control over who disseminates litigation information to the department best able to do so." Resolution 99–11 designates the proper channel for seeking redress from the County; it does not prohibit the Landowners from petitioning the County. Accordingly, we find that the district court properly held that "there is no basis in fact to conclude that [the County] depriv[ed] [the Landowners] of any of their rights through this resolution."

## VI. RES JUDICATA BARS THE LANDOWNERS' CHALLENGE THAT PERCOLATION TESTING REQUIREMENTS WERE ILLEGAL

■ ¶ 42 The Landowners allege that the County requirement that percolation tests be performed at a depth of four feet, ten inches was arbitrary, illegal, and in direct violation of Utah law. Utah Administrative Code rule 317–4–5.4 requires that percolation tests be made "at points and elevations ... typical of the area in which the absorption system will be located." Contrary to this specification, the County required septic systems used in Canyon Meadows to be placed no deeper than ten inches below the surface, but required percolation tests to be performed four feet below the installation level.

■ ¶ 43 The Landowners originally raised this issue in a separate lawsuit that was never consolidated with this case and that was dismissed with prejudice on December 22, 2000. The Landowners assert that the parties stipulated to the dismissal with

the joint understanding that the issue would be addressed in this case and that the County has now deceitfully altered its position by urging us to affirm the district court's holding that res judicata bars consideration of the issue in this case. The Landowners urge us to void the stipulation due to misrepresentation, fraud, or mistake and to grant them relief from its effects. *See* 17 Am.Jur.2d *Contracts* § 143 (1964). They rely on *Tanner v. Dist. Judges,* 649 P.2d 5 (Utah 1982). Their argument misconstrues the holding in that case. The stipulation at issue in *Tanner* was part of a pending case—one that had not proceeded to final judgment—and we explicitly stated that our holding was limited to the procedural posture of that case. Ordinarily, dismissal with prejudice constitutes a final judgment. *See Speros v. Fricke,* 2004 UT 69, ¶ 19, 98 P.3d 28. Therefore, the district court did not err when it held that res judicata precluded it from considering the alleged violations by the County in connection with the percolation testing requirements.

## VII. THE LANDOWNERS' REQUEST THAT THE DISTRICT COURT GRANT THE COUNTY'S MOTION FOR SUMMARY JUDGMENT ON THE "REMAINING ISSUES" CONSTITUTED ACQUIESCENCE IN THE JUDGMENT AND WAIVER OF THE RIGHT TO CONTEST THOSE ISSUES ON APPEAL

¶ 44 The district court's March 5, 2002 decision on the parties' pending cross-motions disposed of all but the following four issues: (1) whether the County was estopped from refusing to issue building permits based on alleged representations to the contrary made by Mr. Mathis and Mr. Wright; (2) whether the County enforced Ordinance 97–13 longer than six months; (3) whether Mr. Mathis enforced Ordinances 97–1 and 97–13 longer than six months, in violation of the Landowners' federal constitutional rights, entitling them to punitive damages; and (4) whether the extent and quality requirements of the percolation tests violated the Landowners' federal constitutional rights and entitled them to punitive damages. The district court labeled these four issues the "remain-

ing issues" and scheduled them for argument on September 20, 2005.

¶ 45 The County filed another motion for summary judgment on the remaining issues and the Landowners filed a response in opposition. At the scheduled hearing, without forewarning to either the County or the court, counsel for the Landowners said, "[i]t's in the best interests of this court and all the parties that the court rule against my client on this apparent motion for summary judgment." After colloquy with the court, counsel conceded that he did not have facts sufficient to adequately defend against the County's summary judgment motion. Counsel apparently believed that dismissal of the remaining issues would enable him to raise all of the issues together on appeal and revive his ability to support the Landowners' arguments on the remaining issues. The district court granted the County's motion for summary judgment and "based upon the facts presented by and the arguments asserted in defendants' supporting and reply memoranda" dismissed the remaining issues with prejudice.

¶ 46 "As a general rule, ... one who acquiesces in a judgment cannot later attack it." *Trees v. Lewis,* 738 P.2d 612, 613 (Utah 1987). In *Ottenheimer v. Mountain States Supply Co.,* 56 Utah 190, 188 P. 1117, 1117 (1920), a property dispute arose when the plaintiff sought to recover possession of a parcel of real property allegedly wrongfully withheld by the defendant. The defendant alleged that he occupied the property by virtue of a valid lease that was not due to expire for several years. *Id.* The district court ruled in favor of the plaintiff. *Id.* The defendant appealed the court's decision, but also surrendered the premises. *Id.* at 1117–18. Despite written notice to the plaintiff from the defendant explaining that he did not intend to waive his right to appeal by moving off the land, we granted the plaintiff's motion to dismiss the appeal on the basis that "the acquiescence in the judgment and the surrendering of possession of the premises necessarily amounts to a waiver of all the litigated questions." *Id.* at 1118–19.

¶ 47 We find the actions of the Landowners here analogous to the situation in *Otten-*

*heimer*. Like the defendant's surrender of possession of the property in *Ottenheimer*, counsel for the Landowners did not intend to waive the right to appeal when he requested the entry of judgment against his clients. Nonetheless, his action constituted a waiver of the right to appeal; acquiescence in a dismissal with prejudice preserves no issues for review.

## VIII. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN IT AWARDED THE COUNTY ITS ATTORNEY FEES INCURRED IN DEFENSE OF THE REMAINING ISSUES

¶ 48 The district court did not abuse its discretion when it granted the County's motion for attorney fees pursuant to 42 U.S.C. § 1988. The County requested only those attorney fees incurred in connection with its preparation for the anticipated trial on the remaining issues, which were ultimately dismissed as explained above. "[W]e review an attorney's fee award under 42 U.S.C. § 1988(b) for an abuse of discretion." *Robinson v. City of Edmond*, 160 F.3d 1275, 1280 (10th Cir.1998).

¶ 49 The remaining issues were left over from the district court's March 5, 2002 decision. More than three and one-half years passed before the hearing on the remaining issues took place on September 20, 2005. During the interim period, the parties engaged in additional discovery and filed numerous procedural motions with the district court. In making its award, the district court concluded that the Landowners "knew or should have known upon responding to [the County's] narrowly tailored written discovery requests on July 26, 2002, that they had insufficient factual grounds upon which to succeed on their [remaining] claims." The court found that the Landowners "nonetheless continued to vigorously litigate these claims unnecessarily" and that it was "not until the moment of oral argument on [the County's] motion for summary judgment . . . [at which point] several other motions had been decided, and several more had been fully briefed and were awaiting decision," that the Landowners ultimately conceded they had insufficient evidence to support their remaining claims.

¶ 50 Prevailing defendants may be awarded their attorney fees related to defending frivolous, unreasonable, or groundless claims if a plaintiff continues to litigate them after they become clearly groundless. *Prochaska v. Marcoux*, 632 F.2d 848, 854 (10th Cir.1980) (holding that prevailing defendants should be awarded fees if " 'a court finds that [the plaintiff's] claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so.' " (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978)) ). While we do not assume that the Landowners' counsel believed the remaining issues to be frivolous, unreasonable, or groundless at the outset of the case, or even at the time of the March 2002 order, counsel should have notified the court and the County that he had insufficient evidence available to litigate the remaining issues as soon as it became evident to him, which the district court found, at the latest, to be on July 26, 2002, the date the Landowners responded to the County's additional discovery requests (less than four months after the 2002 decision and more than three years before the hearing on the remaining issues). Our review of the record and of the relevant sequence of events leads us to conclude that the district court acted within its discretion when it granted the County's motion for attorney fees related to the County's preparation to defend the remaining issues. Therefore we affirm on this point.

## IX. THE DISTRICT COURT'S GRANT OF THE COUNTY'S MOTION TO COMPEL THE LANDOWNERS TO ANSWER INTERROGATORIES WAS NOT AN ABUSE OF DISCRETION

¶ 51 "Because trial courts have broad discretion in matters of discovery, this issue is reviewed for abuse of discretion." *Green v. Louder*, 2001 UT 62, ¶ 37, 29 P.3d 638. We find that the district court did not abuse its discretion when it compelled the Landowners to answer the County's interrogatories asking them to identify the law

they alleged defendants Mr. Mathis and Mr. Wright violated in relation to the percolation test standards. The Landowners contend that the interrogatories improperly sought legal conclusions and opinions from lay witnesses. Rule 33(b) of the Federal Rules of Civil Procedure, which Utah has adopted, governs the use of answers and objections to interrogatories. *See* Utah R. Civ. P. 33(b). The 1970 advisory committee notes state that rule 33 was "amended to provide that an interrogatory is not objectionable merely because it calls for an opinion or contention that relates to fact or the application of law to fact." Fed.R.Civ.P. 33(b) advisory committee's note. Because the interrogatories objected to by the Landowners directly related to the facts of the alleged County violations, it was proper, and, therefore, not an abuse of discretion for the district court to order the Landowners to respond.

## X. THE DISTRICT COURT'S GRANT OF THE COUNTY'S MOTION TO LIMIT THE PLAINTIFFS IN THE SUIT TO THOSE NAMED IN THE LANDOWNERS' AMENDED COMPLAINT WAS NOT AN ABUSE OF DISCRETION

¶ 52 Although we have never had the opportunity to review an appeal from a district court's dismissal of plaintiffs designated in the complaint as "John Does," we deem such a decision akin to a determination of whether a party should be joined to an action, which we will not disturb absent an abuse of discretion. *See Green v. Louder,* 2001 UT 62, ¶ 40, 29 P.3d 638.

¶ 53 The Landowners' pleadings throughout this case have listed, in addition to several named plaintiffs, up to seventy-two John Doe plaintiffs. The Landowners suggest that this was done "purely in the interests of judicial economy" in order to keep litigation costs down and to reduce the number of motions before the court that would have arisen each time "a home was sold and a new landowner became an interested party." They further argue that the County has always known the identity of each John Doe plaintiff because each was identified on documents listing the property owners' home values and because the County deposed many of the John Doe plaintiffs in a related, but dismissed, federal case.

¶ 54 For its part, the County argues that rule 10(a) of the Utah Rules of Civil Procedure requires that a complaint "include the names of all the parties" and that, therefore, the Landowners were precluded from litigating on behalf of the John Doe plaintiffs. Utah R. Civ. P. 10(a). In support of the rule's enforcement, the County identifies two recognized exceptions, but goes on to explain why they do not apply to the John Doe plaintiffs in this case. First, the John Doe plaintiffs do not have an important privacy interest in need of protection. *See Lindsey v. Dayton–Hudson Corp.,* 592 F.2d 1118, 1125 (10th Cir.1979) (stating that the use of an unnamed plaintiff is an unusual procedure and should only be allowed when there is an important privacy interest). Second, no John Doe plaintiff can reasonably be considered an indispensable party to the lawsuit. *See Intermountain Physical Med. Assocs. v. Micro–Dex Corp.,* 739 P.2d 1131, 1132 (Utah Ct.App.1987) (permitting plaintiff's motion to amend its complaint to add three plaintiffs who were found to be indispensable parties). Additionally, the County points out that there were other procedural avenues available to the Landowners that would have permitted them to achieve the efficiencies they were seeking without resorting to the use of the John Doe designation for additional interested parties, such as petitioning the court for class certification.

¶ 55 On the other hand, we sympathize with the Landowners' frustration with respect to this issue because we recognize that substantial discovery was conducted in a related federal court case that was ultimately dismissed and refiled in state court, allegedly upon agreement by the parties that they would continue to use and rely upon much of the discovery from the federal court case. In that case, many of the John Doe plaintiffs took part in depositions and provided answers to interrogatories and other requests for factual development of the issues. Those documents have been used and relied upon by the parties in this case. Indeed the Landowners presented examples of docu-

ments submitted by the County in this case that specifically relate back to documents submitted in the prior federal court case, such as "Defendants Third Set of Written Discovery" and the "continued deposition" of Phil Wright.

¶ 56 While we recognize that these are persuasive arguments from both parties on this issue, on balance we are not persuaded that the district court abused its discretion in dismissing the John Doe plaintiffs. Our decision is bolstered by the fact that the Landowners claim that their use of the John Doe designation was done in the interest of judicial economy in order to avoid "the necessity of having to amend the complaint every time a home was sold and a new land owner became an interested party," thus implying that sales and transfers happened frequently, while simultaneously arguing that the regulations imposed on the property temporarily devalued it to such a degree that it could not be sold at all, at least not without significant economic loss. Thus, we conclude that the district court did not abuse its discretion in dismissing the John Doe plaintiffs, and we affirm its dismissal.

### CONCLUSION

¶ 57 We affirm the district court's order of summary judgment, except as to its dismissal of the equal protection claim. That portion of the case is remanded to the district court for further proceedings.

¶ 58 Associate Chief Justice WILKINS, Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Chief Justice DURHAM's opinion.