2009 UT 66

**Ralph L. DANIELS and Tracey H. Daniels, Plaintiffs and Appellant,**

v.

**GAMMA WEST BRACHYTHERAPY, LLC; John K. Hayes; Salt Lake Regional Medical Center; and University Hospital, Defendants and Appellees.**

No. 20080201.

Supreme Court of Utah.

Oct. 2, 2009.

Rehearing Denied Nov. 23, 2009.

---

George T. Naegle, Robert G. Wright, Brandon B. Hobbs, Zachary E. Peterson, Salt Lake City, for defendants.

DURHAM, Chief Justice:

## INTRODUCTION

¶1 The Utah Health Care Malpractice Act requires a patient to bring a claim for malpractice no more than two years after the patient discovers or should have discovered the injury. We have interpreted this requirement to mean a patient must discover the legal injury—that is, both the fact of injury and that it resulted from negligence—before the statute of limitations begins to run. In this case, the plaintiff and appellant, Ralph L. Daniels, asks this court to determine whether under this discovery rule the statute of limitations period for his claim was triggered when he discovered that he might have been treated negligently during the course of multiple procedures performed at different times and by different providers, or when he discovered that the specific treatment he received from John K. Hayes and Gamma West Brachytherapy, LLC (collectively, the Defendants) might have been negligent. We hold that the Health Care Malpractice Act statute of limitations does not begin to run until a patient discovers or should have discovered his legal injury, including the causal event of such injury.

¶2 Mr. Daniels also asks this court to consider several other pretrial rulings made by the district court regarding the admission of evidence and dismissal of claims. We affirm in part and reverse in part and remand for proceedings consistent with this opinion.

## BACKGROUND

### I. MR. DANIELS WAS DIAGNOSED WITH AND TREATED FOR COLON CANCER

¶3 Mr. Daniels was diagnosed with stage II[1] colon cancer in January 2001. To treat the cancer, his surgeon and a Gamma West oncologist considered two options. The first

---

Kay Burningham, Park City, for plaintiff.

1. Gamma West and Dr. Hayes alleged that Mr. Daniels's cancer was diagnosed as stage IV. This is an issue of fact that is not relevant to any of our holdings today; therefore, we leave it to the appropriate fact-finder to resolve.

option, being the more standard treatment for colon cancer, was to administer preoperative radiation to the locale of the cancer in order to shrink the tumor and thereby improve the likelihood that the entire tumor could be removed during surgery. The second option was to remove as much of the tumor as possible and then apply high-dose rate brachytherapy (high dose radiation)[2] to kill what remained of the tumor. In Mr. Daniels's case, it was determined that surgery followed by high dose radiation therapy and then external radiation beam therapy (external radiation) would provide the best treatment.

¶ 4 Before surgery and the insertion of the high dose radiation catheters, Mr. Daniels signed Gamma West's standard informed consent form. This form, he argues, failed to fully disclose numerous aspects of his radiation treatment. For example, Mr. Daniels has alleged that he was not advised nor did he consent to the experimental nature of using high dose radiation therapy for his type of cancer. He also alleges that he was not informed of the risk of radiation burns.

¶ 5 As planned, Dr. Mintz removed the tumor and Dr. Hayes, a Gamma West physician, inserted the high dose radiation catheters on January 19, 2001. Following the surgery at Salt Lake Regional Medical Center, Dr. Hayes administered high dose radiation for four days, after which the catheters were removed. About one month later, Mr. Daniels received external radiation beam therapy at University of Utah Hospital. This treatment was administered over several weeks. Mr. Daniels alleges that the combined effect of the high dose radiation and the external radiation therapies was a biological equivalent dose of 90,500 cGy. Radiation therapy typically does not exceed 5,040 cGy.

## II. FOLLOWING RADIATION TREATMENT, MR. DANIELS EXPERIENCED EXTREME COMPLICATIONS

¶ 6 In the middle of his external radiation treatment, Mr. Daniels began to experience dire complications. First, a forty-year old inguinal hernia scar began to disintegrate. Mr. Daniels consulted with both his primary care physician and a radiation oncologist at the University of Utah. Neither informed him that the high dose radiation could have caused the hernia scar's breakdown. Instead, the radiation therapist indicated that it was likely due to an infection. Mr. Daniels also visited Dr. Mintz, who allegedly told Mr. Daniels that external radiation likely caused the problems with his hernia scar.[3] Dr. Mintz then performed surgery to repair the open wound. At the recommendation of his external radiation oncologists, Mr. Daniels returned to the University of Utah for additional external radiation treatment at the end of April 2001.

¶ 7 The next month Mr. Daniels's recent midline and colostomy incisions also began to break down. He again consulted with Dr. Mintz, who admitted him to Salt Lake Regional Medical Center. Within a few days, Mr. Daniels's two incisions and hernia scar coalesced into a sizable, infected wound. Mr. Daniels was then transferred to the University of Utah Burn Unit, where doctors performed debriding and skin grafts in an effort to lessen Mr. Daniels's complications. During the following years, Mr. Daniels underwent numerous surgeries including: "ilieostomy, ileoconduit, multiple debridements of necrotic tissue ..., surgery for blockages, nephrostomies for kidney malfunction ..., and dialysis." He continues to suffer from the complications allegedly arising out of the radiation treatment.

¶ 8 In June 2001, Mr. Daniels's wife met with Dr. Patton at the University of Utah to discuss the cause of Mr. Daniels's severe health problems. Dr. Patton told her that neither the high dose radiation nor the external radiation Mr. Daniels received could have caused his abdominal breakdown.

¶ 9 Mr. Daniels began to suspect that high dose radiation therapy was indeed the cause

---

**2.** High dose radiation is performed by inserting catheters near the location of a cancerous tumor. Radiation is then delivered directly to the cancer-affected area to remove any remaining cancer cells.

**3.** The parties dispute when Dr. Mintz told Daniels that he suspected external radiation could have caused the open wound. We make no finding, as this is an issue properly reserved for a fact finder.

of his complications during the spring of 2002. At that time he was being treated in the University Hospital's Burn Unit. While there he overheard one of his treating physicians explain to the resident physicians that Mr. Daniels "had brachytherapy and had the Holy Jesus burned out of him."

## III. MR. DANIELS SUED; HE LATER ADDED CLAIMS TO HIS COMPLAINT BUT WAS NOT ALLOWED TO ADD A CLAIM FOR FRAUDULENT CONCEALMENT

¶ 10 After filing a notice of intent to sue, Mr. Daniels sued Gamma West Brachytherapy, John K. Hayes, M.D., the University Hospital, and Salt Lake Regional Medical Center in December 2003 for medical negligence.[4] Following discovery, the University of Utah and Salt Lake Regional Medical Center moved for summary judgment on all claims against them. In August 2006, Mr. Daniels noted in a memorandum opposition that he might amend his complaint to add a fraudulent concealment claim depending on the outcome of discovery. The fact discovery deadline passed in September 2006. Mr. Daniels moved to amend his complaint in December 2006, alleging gross medical negligence, lack of informed consent, and breach of fiduciary duty. The trial court granted Mr. Daniels's motion. In July 2007, Mr. Daniels again moved to amend his complaint to add a fraudulent concealment claim. The trial court denied his motion, finding the amendment untimely and prejudicial.

## IV. THE TRIAL COURT DENIED MR. DANIELS'S ATTEMPT TO SUPPLEMENT ONE OF HIS EXPERTS' TESTIMONY FOLLOWING THE EXPERT'S SECOND DEPOSITION

¶ 11 As part of discovery, Defendants deposed Mr. Daniels's expert radiation oncologist, Dr. Sidney Kadish, on May 26, 2006 and September 18, 2006. Dr. Kadish subsequently read another expert's deposition that was taken on October 20, 2006. After reading the deposition and again reviewing Mr. Daniels's patient records, Dr. Kadish faxed changes to his deposition on October 23,

2006. In his previous depositions, Dr. Kadish stated that the high dose radiation had damaged Mr. Daniels's left ureter; on October 23, Dr. Kadish wrote that the high dose radiation had also damaged Mr. Daniels's right ureter. Defendants filed a motion to strike the changes to Dr. Kadish's deposition. The trial court granted the motion, finding that the changes were not merely corrections to the deposition but new testimony.

## V. THE TRIAL COURT DISMISSED MR. DANIELS'S CLAIM FOR PUNITIVE DAMAGES, WHICH HE BASED ON HIS CLAIMS FOR GROSS NEGLIGENCE, AND BREACH OF FIDUCIARY DUTY

¶ 12 After discovery, Defendants filed dispositive motions seeking to dismiss Mr. Daniels's claims for gross negligence, punitive damages, and breach of fiduciary duty. The court denied Defendants' motion to dismiss Mr. Daniels's gross negligence claim finding that the allegations put forth by Mr. Daniels, if proven, would support a claim for gross medical negligence. The trial court, however, granted partial summary judgment on Mr. Daniels's claim for punitive damages. In doing so, the trial court noted that an award of punitive damages requires willful or intentional conduct, while gross negligence does not.

¶ 13 Additionally, the trial court granted summary judgment on Mr. Daniels's breach of fiduciary duty claim. The Defendants argued that Utah law does not recognize any disclosure duty for physicians, and moreover, the disclosure that Mr. Daniels argued for is addressed by the informed consent statute. The trial court agreed and granted the motion.

¶ 14 Mr. Daniels's case was bifurcated for trial. The court first held a jury trial to determine whether the statute of limitations barred Mr. Daniels's claims.

## VI. THE TRIAL COURT EXCLUDED EVIDENCE OF WITNESSES' INSURANCE COVERAGE

¶ 15 Prior to trial, both parties filed numerous motions in limine. Defendants' Mo-

---

4. Mr. Daniels's original complaint included his wife, Tracey H. Daniels, as a plaintiff and a claim

for loss of consortium. This claim was dismissed and is not part of this appeal.

tion in Limine 3, which is now on appeal, sought to exclude all evidence of or any reference to liability insurance. Mr. Daniels opposed this motion arguing that potential jurors should be questioned about their relation to the insurance industry pursuant to rule 411 of the Utah Rules of Evidence. Mr. Daniels also argued that under the same rule, his counsel should be able to use proof of insurance to show the bias of doctor witnesses, who were all members of the same insurance exchange.

¶ 16 At a pretrial hearing, the trial court granted Defendant's Motion in Limine 3, finding that Mr. Daniels had not provided sufficient evidence of bias based on a shared insurance provider. After the trial court made this order orally, Mr. Daniels's counsel asked the judge whether the potential jurors could be questioned about their exposure to or relationship with the insurance industry. The judge indicated that he would address this issue at trial.

¶ 17 On the first day of trial, the judge began voir dire by submitting a questionnaire to the prospective jurors. During a brief discussion with counsel, the judge indicated that there were still a few questions on which the parties had not agreed, but that he would resolve them. The judge then gave counsel a few minutes to review the jurors' answers to the questionnaire. Subsequently, the court began questioning the venire panel. During voir dire, the court inquired into each person's occupation, as well as their spouses' occupation, and their experiences with medical care. At the conclusion of the questioning, the court asked counsel for additional or follow-up questions. Mr. Daniels's counsel asked the judge to inquire if any of the members of the jury had ever missed the deadline for filing a lawsuit. She did not ask the judge to question the panel regarding relationships to the insurance industry.

## VII. THE TRIAL COURT INSTRUCTED THE JURY THAT THE STATUTE OF LIMITATIONS BEGAN WHEN MR. DANIELS DISCOVERED HIS MEDICAL TREATMENT HAD BEEN NEGLIGENT

¶ 18 The parties presented evidence and argument regarding the statute of limitations during a three-day trial. In the court's and counsel's discussions of which jury instructions to use, Mr. Daniels's counsel repeatedly requested both an instruction defining negligence by its elements and an instruction that specifically indicated the statute of limitations did not begin to run until Mr. Daniels discovered the cause of his alleged negligent injury. Specifically, she stated: "I'd like to make a record. I think there are two types of cause, and I think it's extremely important that the jury be instructed on both. One is cause in fact, the other is legal cause." The trial court initially declined both requests. However, in the final version of the jury instructions, the trial court included a brief definition of negligence, but did not include its elements. Commenting on this instruction, Mr. Daniels's counsel indicated that she was pleased with the court's inclusion of a negligence definition but went on to object to the special verdict form used by the trial court. She said, "[M]y objections for the record are ... I don't think that the case ... that holds you don't have to know the identity of the tortfeasor can be extended to include you don't have to know what the cause in fact of the malpractice was, and that's my objection." The trial court acknowledged that this was Mr. Daniels's "objection all along" but declined to alter the jury instruction. Thus the special verdict form presented to the jury asked them to determine whether Mr. Daniels knew or should have known he had an injury by May 6, 2001 and if so, whether he knew or should have known by the same day that the injury was attributable to negligence.

¶ 19 The jury returned a verdict for the Defendants, finding that Mr. Daniels knew or reasonably should have known on or before May 6, 2001 of an injury and that the injury was attributable to negligence. Mr. Daniels appeals the verdict. We have jurisdiction pursuant to Utah code section 78A-3-102(3)(j) (2008).

## ANALYSIS

¶ 20 Mr. Daniels raises eight arguments for our consideration: (1) the jury instruction regarding what the plaintiff must discover to

trigger the statute of limitations was erroneous; (2) the trial court abused its discretion in admitting evidence that Mr. Daniels originally sued the University Hospital and Salt Lake Regional Medical Center; (3) the trial court abused its discretion by declining to question potential jurors about their relationships to the insurance industry; (4) the trial court abused its discretion in excluding evidence that defense witnesses and the Defendants shared the same insurance provider; (5) the trial court erred in granting summary judgment on the issue of punitive damages; (6) the trial court erred in granting summary judgment on Daniels's claim for breach of fiduciary duty; (7) the trial court improperly excluded the supplementation of Mr. Daniels's expert witness's deposition; and (8) the trial court abused its discretion in denying Mr. Daniels's leave to amend his complaint to add a fraudulent concealment claim. We address each of these arguments in turn.

## I. UNDER THE DISCOVERY RULE OF THE UTAH HEALTH CARE MALPRACTICE ACT, AN INJURY IS DISCOVERED WHEN THE PATIENT BECOMES AWARE OF THE POSSIBLE CAUSAL EVENT OF HIS MEDICAL INJURY

¶ 21 Mr. Daniels argues that the trial court's jury instruction was erroneous because it failed to instruct the jury that the statute of limitations did not begin to run on his claims until he discovered that the high dose radiation therapy might be the cause of his injuries. Instead, the trial court's jury instructions and special verdict form indicated that a plaintiff must only discover an injury and that the injury was the result of negligence. The trial court specifically declined to include an instruction that the plaintiff must discover which event caused the alleged negligent injury.

¶ 22 Challenges to jury instructions require interpretations of law; therefore, we review them for correctness. *Child v. Gonda,* 972 P.2d 425, 429 (Utah 1998). As discussed below, we conclude first that Mr. Daniels properly preserved his challenge to the jury instructions by timely objecting to the jury instructions and the special verdict

form. Second, we hold that the trial court's jury instruction misapplied the Utah Health Care Malpractice Act and our case law interpreting its discovery requirements.

### A. Mr. Daniels Adequately Preserved His Challenge to the Statute of Limitations Jury Instruction

¶ 23 "Generally, 'in order to preserve an issue for appeal the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue.'" *Pratt v. Nelson,* 2007 UT 41, ¶ 15, 164 P.3d 366 (quoting *Brookside Mobile Home Park, Ltd. v. Peebles,* 2002 UT 48, ¶ 14, 48 P.3d 968). In determining whether an issue was properly presented to the trial court, we consider whether a party timely and specifically raised the issue and presented supporting authority. *Id.* In this case, Mr. Daniels's counsel adequately preserved her objection to the court's jury instruction by continually requesting a jury instruction that reflected a different interpretation of the statute of limitations requirement, and by specifically objecting to the jury instructions and special verdict form used by the trial court.

¶ 24 Defendants argue that Mr. Daniels's counsel waived her objection and invited error by agreeing to the court's jury instruction on negligence. We disagree. After discussing the jury instruction that defined negligence, Mr. Daniels's counsel went on to object to the special verdict form used by the trial court. She said, "[M]y objections for the record are . . . I don't think the case . . . that holds you don't have to know the identity of the tortfeasor can be extended to include you don't have to know what the cause in fact of the malpractice was, and that's my objection." This objection and those that preceded it were timely. They were made while the trial court was contemplating the jury instructions the court would use during this case. Moreover, Mr. Daniels's counsel specifically objected to both the jury instructions and the special verdict form, and she specifically identified her concerns and how she believed the law should be reflected in the jury instructions. Finally, Mr. Daniels's counsel provided the court

with authority, existing case law and the model jury instruction to support her position. Thus, the objections of counsel properly preserved Mr. Daniels's challenge to the legal issue.

### B. The Trial Court Erred by Failing to Instruct the Jury That the Statute of Limitations Does Not Begin to Run Until the Patient Discovers the Causal Event of His Medical Injury

¶ 25 The Utah Health Care Malpractice Act requires that "[a] malpractice action against a health care provider ... be commenced within two years after the plaintiff or patient discovers, or through the use of reasonable diligence should have *discovered the injury*, whichever first occurs...." Utah Code Ann. § 78B–3–404(1) (2008) (emphasis added). We have repeatedly interpreted the phrase "discovered the injury" as meaning discovering the "injury and the negligence which resulted in the injury," also referred to as "legal injury." *Foil v. Ballinger*, 601 P.2d 144, 148 (Utah 1979); *see also Brower v. Brown*, 744 P.2d 1337, 1338–39 (Utah 1987)("This Court has defined discovery of the injury as knowledge of a legal injury; that is, the plaintiff must know of the injury and of the negligence which caused the injury."). The application of this test to a factual scenario where multiple medical events may have caused the plaintiff's alleged injury is an issue of first impression for this court. We hold that discovering a legal injury includes discovering the causal event of the injury. Further, we emphasize that the determination of when a plaintiff is aware of the causal fact turns on a jury's determination of when a plaintiff acting with reasonable diligence discovered or should have discovered *which* event might have caused his injury. We address these two points in turn.

¶ 26 Discovering a legal injury requires a discovery of the causal event of the injury. This interpretation is consistent with both the plain language of the Health Care Malpractice Act and underlying policy previously considered in our health care statute of limitations cases.

¶ 27 In previous cases we have repeatedly emphasized that a plaintiff has not discovered his injury until he is aware that negligence may have caused the injury. *Deschamps v. Pulley*, 784 P.2d 471, 473 (Utah Ct.App.1989). *Hove v. McMaster*, 621 P.2d 694, 696 (Utah 1980); In *Foil*, we specifically held that discovery "means discovery of [the] injury and *the negligence* which resulted in the injury." 601 P.2d at 148 (emphasis added). As rephrased in *Brower*, this requires that the plaintiff "know of the injury and of *the negligence which caused the injury.*" 744 P.2d at 1338–39 (emphasis added). Nothing in the statute's language or our interpretation of the statute limits the discovery of an injury to merely suspecting negligence without identifying its source. In fact, our precedent directs us to the opposite conclusion. That is, a patient cannot know "the negligence which resulted in injury" without knowing what medical treatment or procedure caused his injury. Defendants disagree with this interpretation and rely on a decision of the court of appeals, *McDougal v. Weed*, 945 P.2d 175 (Utah Ct.App.1997), for the proposition that a plaintiff must only suspect medical negligence before the statute of limitations is triggered. Defendants' argument construes the *McDougal* holding too broadly.

¶ 28 Under *McDougal*, a plaintiff need not know the identity of the responsible tortfeasor, but must know which medical event allegedly caused his injury. In *McDougal*, the patient sued one doctor, dismissed that action, and then sued a second doctor in relation to a claim arising from the same medical event—emergency room treatment for a separated shoulder. *Id.* at 176. The patient argued that the statute of limitations was not triggered until he discovered the actual identity of his treating physician. *Id.* at 177. The court of appeals disagreed. *Id.* at 177–78. Relying on *Foil* and case law from other states, the court of appeals held "that the medical malpractice statute of limitations is tied only to the discovery of the plaintiff's legal injury and not to the discovery of the tortfeasor's identity." *Id.* at 178.

¶ 29 In Mr. Daniels's case, however, it is not the identity of a specific tortfeasor that is at issue, but rather the identification of the medical event that caused the injury. The

discovery of legal injury requires the discovery of the causal event, which differs from the discovery of a responsible tortfeasor from among several actors connected to a single medical event. In the single-event/multiple-actor circumstance, a patient who is injured and suspects negligence may investigate this suspicion with adequate time to bring a claim based on the facts of that medical treatment. Unknown defendants may be added as the case progresses. In such cases, the patient has discovered his legal injury, including the medical injury and its source. In contrast, when a patient has received multiple medical treatments or undergone numerous medical procedures, and subsequently suffers unforeseen complications or reactions, he may suspect negligence. This patient, however, has not discovered his legal injury because, while he is aware that he is injured, and even if he is aware that negligence may be the source, he has not sufficiently tied it to its source in a medical procedure. Therefore, we hold, based on the language of the Health Care Malpractice Act and our case law interpreting it, while a patient may not be required to discover the specific individual responsible for his injury, he must discover the causal event before the statute of limitations begins to run.

¶ 30 Additionally, the policy underlying our previous interpretations of the Health Care Malpractice Act also requires that the statute of limitations not be triggered until the patient discovers which medical event allegedly caused his injury. In *Foil* we explained that the statute of limitations should be interpreted in a way that discourages unfounded law suits. 601 P.2d at 148. Thus, "when injuries are suffered that have been caused by an unknown act of negligence ... the law ought not to be construed to destroy a right of action before a person even becomes aware of the existence of that right." *Id.* at 147. Otherwise, a patient is forced to sue his health care professionals as soon as he is injured and before he is aware of any fault in his medical care in order to have a right of action. As we explained when originally adopting this discovery rule, "[i]t seems somewhat incongruous that an injured person must commence a malpractice action prior to the time he knew, or reasonably should

have known, of his injury and right of action." *Christiansen v. Rees*, 20 Utah 2d 199, 436 P.2d 435, 436 (1968). With these concerns in mind, it follows that a patient must not only suspect negligence in a medical treatment, but must also suspect which treatment in particular implicates negligent care to avoid pursuing unfounded litigation.

¶ 31 Tying the statute of limitations' trigger to the discovery of the cause-in-fact of a patient's injury does not leave health care professionals endlessly susceptible to revived claims. Instead, the discovery rule is tempered by a requirement that a patient act with reasonable diligence in investigating a suspected injury. Thus, the statute of limitations begins when exercising such diligence a patient should have discovered his injury and its possible negligent cause. Whether and when a patient should have discovered an injury and its cause is a fact-intensive question that requires a jury to determine, given the information available, whether the actions taken in response to an injury and the efforts extended to discover its cause were adequate. The jury cannot undertake such a fact-specific inquiry without being informed as to which event it is evaluating for whether the plaintiff was aware or should have been aware of what was the negligent cause of his injury. Therefore, we conclude that the trial court's jury instruction was in error because it failed to explain that the statute of limitations did not begin to run until Mr. Daniels discovered that the Defendants' treatment and care might have been negligent and thus might have caused his injuries.

II. THE DISTRICT COURT ERRED BY ADMITTING MR. DANIELS'S SUPERSEDING COMPLAINT BECAUSE IT WAS IRRELEVANT TO SHOW WHEN MR. DANIELS SUSPECTED HIS RADIATION TREATMENT WAS THE CAUSE OF HIS INJURIES

¶ 32 The trial court abused its discretion by admitting Mr. Daniels's superseded complaint into evidence because it based its decision on an erroneous interpretation of the Health Care Malpractice Act

statute of limitations. Under the correct interpretation, the Defendants' purpose for admitting the pleading was irrelevant. "[W]e grant a trial court broad discretion to admit or exclude evidence and will disturb its ruling only for abuse of discretion." *Daines v. Vincent*, 2008 UT 51, ¶ 21, 190 P.3d 1269. "An abuse of discretion may be demonstrated by showing that the district court relied on 'an erroneous conclusion of law' or that there was 'no evidentiary basis for the trial court's ruling.'" *Kilpatrick v. Bullough Abatement, Inc.*, 2008 UT 82, ¶ 23, 199 P.3d 957 (quoting *Morton v. Cont'l Baking Co.*, 938 P.2d 271, 274 (Utah 1997)).

¶ 33 The admission of the superseded complaint was an abuse of discretion because under a proper interpretation of the statute of limitations, the purpose proposed for admitting the pleading would have been irrelevant. In this case, the trial court determined that the superseded complaint was relevant to the Defendants' argument that Mr. Daniels was aware of negligence in his medical treatment before he claimed he suspected the Defendants were negligent because he asserted claims against Salt Lake Regional Medical Center and University Hospital. Under the trial court's interpretation of the Health Care Malpractice Act statute of limitations' discovery rule, this determination was correct. However, as we explained in Part I, the trial court's legal interpretation was incorrect. Under the proper interpretation, admitting the superseded complaint to show that Mr. Daniels had sued other health care providers was irrelevant to show when Mr. Daniels suspected the high dose radiation administered by Defendants to be the cause of his injury. Further, such evidence unfairly prejudiced Mr. Daniels because it confused the jury and was a waste of time. Therefore, in subsequent proceedings the superseded complaint cannot be admitted to show Mr. Daniels suspected other health care providers and sued them for negligence.

### III. MR. DANIELS DID NOT PRESERVE HIS CHALLENGE TO VOIR DIRE

■■ ¶ 34 Despite his opposition to the Defendants' motion in limine, Mr. Daniels's counsel failed to preserve Mr. Daniels's objection to the exclusion of a question regarding potential jurors' relationships to the insurance industry by failing to make a timely, specific objection that provided the court with an opportunity to rule on the issue. More importantly, Mr. Daniels did not adequately brief his preservation of this issue.

¶ 35 Under the Utah Rules of Appellate Procedure, a party must cite to where in the record an issue was adequately preserved. Utah R.App. P. 24(a)(5)(A). In this case, Mr. Daniels did not explain in his brief or reply brief when counsel preserved a challenge to voir dire. Thus, we are left to guess what Mr. Daniels's counsel's theory for preservation may be. Reviewing the record cites included in Mr. Daniels's statement of facts, we conclude that this issue was in fact not preserved for appellate review but instead Mr. Daniels stipulated to voir dire as conducted by the trial court judge.

### IV. EVIDENCE OF INSURANCE MAY BE ADMITTED WHEN THE PLAINTIFF PRODUCES EVIDENCE OF A SUBSTANTIAL CONNECTION BETWEEN THE WITNESS AND THE INSURANCE PROVIDER

■■ ¶ 36 The trial court did not abuse its discretion in excluding evidence of insurance that it found to be more prejudicial than probative. We review a trial court's exclusion of evidence for an abuse of discretion. *Daines v. Vincent*, 2008 UT 51, ¶ 21, 190 P.3d 1269.

■ ¶ 37 The evidence presented by Mr. Daniels was insufficient to show the possibility of bias based on insurance coverage. Utah Rule of Evidence 411 prohibits evidence of liability insurance to show that a person acted negligently but allows evidence of liability coverage to show a witness is biased or prejudiced. Mr. Daniels argues that two of the doctor witnesses in this case changed their testimony between their depositions and trial and that this may be the result of bias based on the fact that they are both insured by the Utah Medical Insurance Association, a physician-owned organization. In many jurisdictions, evidence of a witness's

insurance coverage is only admitted to show bias if there is evidence of a substantial connection between the witness and the insurance company. *See, e.g., Yoho v. Thompson,* 345 S.C. 361, 548 S.E.2d 584, 586 (2001) ("A majority of jurisdictions addressing this issue apply a 'substantial connection' analysis to determine whether an expert's connection to a defendant's insurer is sufficiently probative to outweigh the prejudice to the defendant resulting from the jury's knowledge that the defendant carries liability insurance.") Under that test, a connection is substantial when the witness is employed or has some control in the insurance company. *See Evans v. Colo. Permanente Med. Group,* 902 P.2d 867, 874 (Colo.Ct.App.1995), *rev'd on other grounds,* 926 P.2d 1218 (Colo.1996) (holding that evidence of witness's position as a board member of insurance company was relevant evidence of bias); *Yoho,* 548 S.E.2d at 586 (allowing evidence of insurance when witness was employed as a consultant for insurance company). In instances when there is less of a connection, such as a witness simply holding an insurance policy, courts exclude the evidence as irrelevant or prejudicial. *Warren v. Jackson,* 125 N.C.App. 96, 479 S.E.2d 278, 281–82 (1997). In *Warren,* the plaintiff sought to admit evidence that expert witnesses shared the same malpractice carrier as the defendant. *Id.* at 279. In addressing the issue, the North Carolina court noted that in cases that permitted evidence of insurance to be admitted at trial, the witness had a direct interest in the outcome of the case. *Id.* at 281. For example, the witness was an owner or employee of the insurance provider. *Id.* Acknowledging that policyholders of a mutual insurance company had more of a financial stake than policyholders of other types of insurance providers, the court still held that policy holding status alone did not create a substantial connection. *Id.* Thus, the court upheld the exclusion of evidence of liability insurance. *Id.* at 281–82. We approve of this approach and adopt it in this case.

¶ 38 Applied here, we conclude that there is no evidence in the record of a substantial connection between the doctor witnesses and the Utah Medical Insurance Association; therefore, the trial court did not abuse its discretion in finding the evidence irrelevant and prejudicial. Like the witnesses in *Warren,* the doctor witnesses in this case held insurance policies with the same carrier as the Defendants. However, unlike the witnesses in *Yoho* and *Evans,* the witnesses did not have an employment or control relationship with the provider. Therefore, there was not a substantial connection between the witnesses and the insurance provider. Accordingly, admitting any evidence of liability insurance coverage would be irrelevant and result in prejudice because it would necessarily disclose that the defendant maintained a liability insurance policy.

## V. A CLAIM FOR GROSS NEGLIGENCE MAY SUPPORT A PRAYER FOR PUNITIVE DAMAGES WHEN THE DEFENDANTS' ACTS WERE BOTH KNOWING AND RECKLESS

¶ 39 The trial court erred in granting summary judgment on Mr. Daniels's punitive damage claims based on gross negligence when it relied on the proposition that "[i]n contrast to a claim for punitive damages, a claim for gross medical negligence does not require allegations of willful or intentional conduct." This statement reflects a misunderstanding of the punitive damages statute. To qualify for punitive damages under the statute, an action need not be intentional but may alternatively be knowing and reckless. Utah Code Ann. § 78B–8–201(1)(a) (2008). Therefore, in certain instances, a claim for gross negligence may satisfy the statute's requirement.

¶ 40 "We review the district court's decision to grant summary judgment 'for correctness, granting no deference to the [district] court.'" *Swan Creek Vill. Homeowners Ass'n v. Warne,* 2006 UT 22, ¶ 16, 134 P.3d 1122 (alteration in original) (quoting *Pugh v. Draper City,* 2005 UT 12, ¶ 7, 114 P.3d 546). Similarly, we review a trial court's statutory interpretation for correctness. *Ellis v. Estate of Ellis,* 2007 UT 77, ¶ 6, 169 P.3d 441.

¶ 41 Whether a claim may be the basis for punitive damages is governed by Utah Code section 78B–8–201, which allows punitive

damages to "be awarded only if ... it is established by clear and convincing evidence that the acts or omissions of the tortfeasor are the result of willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others." Utah Code Ann. § 78B–8–201(1)(a) (2008). As stated in the plain language of the statute, two types of conduct justify an award of punitive damages: (1) "willful and malicious or intentionally fraudulent conduct" *or* (2) "a knowing and reckless indifference toward, and a disregard of, the rights of others." *Id.* Gross negligence, by definition, is not willful or intentional; thus, for Mr. Daniels to succeed under the statute, his gross negligence claim must fit into the "knowing and reckless indifference" requirement. *See* W. Page Keeton et al., *Prosser and Keeton on Torts* 161 (5th ed.1984) (discussing how negligence, by definition, consists of conduct where the tortfeasor does not intend to cause harm).

¶ 42 To prove that a tortfeasor's actions were knowing and reckless, a party must prove that the tortfeasor knew of a substantial risk and proceeded to act or failed to act while consciously ignoring that risk. Recklessness includes conduct where "the actor kn[ew], or ha[d] reason to know, ... of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk." Restatement (Second) of Torts § 500 cmt. a (1965). The Utah Legislature added the word "knowingly" to the punitive damages statute to require "the plaintiff [to] prove actual knowledge by the defendant of the danger created by the defendant's conduct." Utah Senate Journal, 48th Leg., Gen. Sess. 705 (Feb. 21, 1989) (statement of Sen. Barlow).

¶ 43 On its face, a standard gross negligence claim partially satisfies the "knowing and reckless indifference" standard because in Utah gross negligence is equated with reckless disregard. *State Tax Comm'n v. Stevenson*, 2006 UT 84, ¶ 25, 150 P.3d 521 ("Authorities have equated reckless disregard with gross negligence."). This court has consistently defined gross negligence as " 'the failure to observe even slight care; it is carelessness or recklessness to a degree that shows utter indifference to the consequences that may result.' " *Atkin Wright & Miles v. Mountain States Tel. & Tel. Co.*, 709 P.2d 330, 335 (Utah 1985)(quoting *Robinson Ins. & Real Estate, Inc. v. Sw. Bell Tel. Co.*, 366 F.Supp. 307, 311 (W.D.Ark.1973)). Recklessness is subsumed in this court's definition of gross negligence. Thus, a party seeking punitive damages based on a proven claim of gross negligence, has already satisfied the reckless requirement of the punitive damages statute.

¶ 44 While all gross negligence claimants can automatically claim recklessness, only some may be able to show that a tortfeasor actually knew of the danger of his or her action or inaction, as opposed to should have known of the danger. What constitutes actual knowledge will be case specific. *Diversified Holdings, L.C. v. Turner*, 2002 UT 129, ¶ 29, 63 P.3d 686 ("While simple negligence will not support punitive damages, negligence manifesting a knowing and reckless indifference toward the rights of others will. A determination must be made on the facts of each case whether the negligence complained of is of the sort that will support punitive damages."). In this case, Mr. Daniels must prove that Dr. Hayes knew of the danger presented by administering high dose radiation in a nonstandard treatment for colon cancer and was indifferent to the outcome.[5]

¶ 45 Because the trial court's order did not adequately address whether Mr. Daniels had adequately alleged a gross negligence claim that involved knowing conduct, we reverse and remand to the trial court to determine whether the gross negligence alleged by Mr.

---

**5.** Mr. Daniels argued that the experimental nature of using high dose radiation to treat colon cancer together with the Defendants' failure to apprise Mr. Daniels about the risks of high dose radiation constitutes gross negligence. To the extent the harm caused by a failure to disclose relates to Mr. Daniels's agreement to undergo the treatment, this allegation must be addressed under the informed consent statute. *See* Part VI, *infra.*

Daniels was both knowing and reckless towards Mr. Daniels's rights.

## VI.  HEALTH CARE PROFESSIONALS OWE THEIR PATIENTS FIDUCIARY DUTIES, BUT THOSE DUTIES MAY BE ABROGATED BY STATUTE

¶ 46 The trial court properly granted the Defendants' motion to dismiss Mr. Daniels's breach of fiduciary duty claim based on nondisclosure because the informed consent statute displaces all common law claims based on failure to inform a patient of the medical risks posed by a medical procedure.  The granting of a motion to dismiss "presents a question of law that we review for correctness.  Moreover, the district court's interpretation of … statutes[ ] and the common law are questions of law that we review for correctness." *Ellis v. Estate of Ellis*, 2007 UT 77, ¶ 6, 169 P.3d 441.

¶ 47 Mr. Daniels argues that the trial court should not have dismissed his claim for breach of fiduciary duty because the common law duty of disclosure is broader than the duty imposed by the informed consent statute.  In contrast, the Defendants urge this court to avoid imposing fiduciary duties on doctors, or at minimum, to not impose a duty of disclosure.  We hold that while doctors owe patients fiduciary duties, the specific duties urged on us here are unavailable due to the informed consent statute.

¶ 48 Doctors stand in a fiduciary relationship with their patients. *See Sorensen v. Barbuto*, 2008 UT 8, ¶ 15, 177 P.3d 614 ("Courts have long characterized the duty physicians have to their patients as fiduciary.").  This is because "[t]he physician has knowledge and skills for which the patient has significant need.  The application of such knowledge and skills requires substantial exercise of discretion. … [And,] the physician voluntarily and expressly undertakes to act primarily for the benefit of the patient." E. Haavi Morreim, *Medical Research Litigation and Malpractice Tort Doctrines: Courts on a Learning Curve*, 4 Hous. J. Health L. &

Pol'y 1, 42–43 (2003).  The asymmetrical relationship between doctors and patients imposes on doctors the responsibility to observe common law requirements of all fiduciary duties unless those duties are abrogated by statute.

¶ 49 Common law claims are retained unless explicitly or implicitly abrogated by statute.  Utah Code Ann. § 68–3–1 (2008) ("The common law of England so far as it was not repugnant to, or in conflict with … the constitution or laws of this state … is hereby adopted, and shall be the rule of decision in all courts of this state.").  A statute preempts a common law claim by specifically adopting a limitation or prohibition on a claim or by comprehensively addressing a particular area of law such that it displaces the common law. *Bishop v. GenTec Inc.*, 2002 UT 36, ¶ 9, 48 P.3d 218.

¶ 50 In this case, Utah's informed consent statute partially abrogates the fiduciary duty of disclosure.[6]  The statute explicitly restricts a party's ability to obtain damages to claims satisfying the elements prescribed in the statute.  Utah Code Ann. § 78B–3–406(1) (2008).  In doing so, the statute abrogates all other claims for failure to disclose the risks presented by a health provider's treatment of a patient.  Additionally, the statute reduces the information a health provider must disclose.  For instance, under the statute, health care providers are not required to fully disclose all the risks of a health care treatment, only those risks that are "substantial and significant" and that could cause "the patient serious harm." *Id.* § 78B–3–406(1)(d).  In contrast, the common law duty to disclose requires a physician to provide a patient with any information material to the decision process of an ordinary individual. *Nixdorf v. Hicken*, 612 P.2d 348, 354 (Utah 1980).  Comparing the two standards, we read the informed consent statute to impose a narrower disclosure requirement, especially in light of the statute's numerous defenses to an informed consent claim.  For example, under the statute a health care provider does not have a duty to disclose information that

---

**6.**  We do not address whether the informed consent statute requires health care providers to inform their patients about the experimental nature of a treatment.  The parties referenced but did not argue this issue on appeal.

in his reasonable discretion he determined would have an adverse affect on the patient. *See* Utah Code Ann. § 78B–3–406(d). Therefore the statute explicitly limits the claims that a patient may employ to obtain damages for failure to disclose and also conflicts with existing causes of action by imposing a narrower duty on health care providers to disclose risks posed by treatments. In such circumstances, the statute prevails.

¶ 51 Of course, if a disclosure does not fall within the confines of the informed consent statute, then its fiduciary nature is retained. For example, the informed consent statute does not remove a doctor's common law fiduciary duty "to disclose to his patient any material information concerning the patient's physical condition." *Nixdorf v. Hicken*, 612 P.2d 348, 354 (Utah 1980). The *Nixdorf* disclosure requirement "differs from that found in the informed consent context." *Id.* at 354 n. 20. Informed consent applies only to pretreatment information about the risks of a procedure or treatment; the fiduciary duty to disclose requires health care providers to apprise patients of material physical conditions throughout the course of their health care. Therefore, patients have a cause of action for breach of the fiduciary duty of disclosure except where a disclosure is explicitly governed by the informed consent statute.

¶ 52 Mr. Daniels also claims Dr. Hayes breached the fiduciary duties of good faith and loyalty. However, we do not address these issues because they were inadequately briefed. Mr. Daniels's brief has "not provided any serious analysis of the issue," *Loveland v. Orem City Corp.*, 746 P.2d 763, 770 (Utah 1987), and we will not assume a party's burden of argument and research. *Smith v. Four Corners Mental Health Ctr., Inc.*, 2003 UT 23, ¶ 46, 70 P.3d 904.

¶ 53 In sum, we hold that health care providers are bound by common law fiduciary duties, including a duty to disclose, except where a statute abrogates those duties. In this case, Mr. Daniels's complaint that Dr. Hayes failed to fully inform him of the risks of high dose radiation falls squarely within the confines of the informed consent statute; therefore, the fiduciary duty of dis-closure does not apply. The trial court properly dismissed Mr. Daniels's claim for breach of fiduciary duty for failure to disclose the risks of high dose radiation.

## VII. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN STRIKING A SUPPLEMENT TO MR. DANIELS'S EXPERT'S DEPOSITION

¶ 54 The trial court did not abuse its discretion by granting the Defendants' motion to strike supplementation to expert testimony. In reviewing the trial court's decision to strike changes to a deposition, we recognize that "trial courts have broad discretion in matters of discovery." *Gardner v. Bd. of County Comm'rs*, 2008 UT 6, ¶ 51, 178 P.3d 893 (quoting *Green v. Louder*, 2001 UT 62, ¶ 37, 29 P.3d 638). The close working relationship between the parties and the district court during the discovery process places the district court in a choice position to make decisions about the scope and nature of discovery. Accordingly, we review the district court's decision under an abuse of discretion standard. *Id.*

¶ 55 Mr. Daniels argues that the trial court should have allowed the changes to Dr. Sidney Kadish's deposition because of the provisions in Utah Rules of Civil Procedure 26(e)(1) and 30(e) that expressly allow supplementation and changes to depositions. Rule 26(e)(1) requires parties to supplement information contained in an expert's deposition if that expert is specially retained or employed for the litigation and if the information is "incomplete or incorrect." Similarly, rule 30(e) allows a deponent to make "changes in form or substance" within thirty days after the deposition. But those changes are not meant "to alter what was said under oath." *Albrecht v. Bennett*, 2002 UT App 64, ¶ 29, 44 P.3d 838 (quoting *Greenway v. Int'l Paper Co.*, 144 F.R.D. 322, 325 (W.D.La. 1992)).

¶ 56 Here, the trial court found that the supplementation to Dr. Kadish's deposition was "new and additional testimony" and that it did not revise incorrect information or make minor changes. Instead, Dr. Kadish added to his opinion after again reviewing

Mr. Daniels's records, which he had access to before both depositions, and reading a deposition of another expert. We hold that the trial court did not abuse its discretion in striking the changes to Dr. Kadish's deposition. The parties deposed Dr. Kadish twice; the changes he sought to make were new testimony, which does not fall under the change or supplementation requirements under rules 26(e)(1) and 30(e).

## VIII. A DISTRICT COURT MAY DENY AN UNTIMELY MOTION TO AMEND

¶ 57 The trial court did not abuse its discretion when it denied Mr. Daniels's second request for leave to amend his complaint because the amendment was untimely and prejudicial. We review a trial court's denial to amend pleadings for abuse of discretion. *See Fishbaugh v. Utah Power & Light,* 969 P.2d 403, 405 (Utah 1998).

¶ 58 Rule 15(a) of the Utah Rules of Civil Procedure states that after responsive pleadings are filed, "a party may amend his pleading only by leave of court ...; and leave shall be freely given when justice so requires." Trial courts should liberally allow amendments unless the amendments include untimely, unjustified, and prejudicial factors. *See Fishbaugh,* 969 P.2d at 408; *Kelly v. Hard Money Funding, Inc.,* 2004 UT App 44, ¶ 26, 87 P.3d 734. Trial courts are not required to find all three factors to deny a motion to amend; "a court's ruling on a motion to amend can be predicated on only one or two of the particular factors." *Kelly,* 2004 UT App 44, ¶ 42, 87 P.3d 734. And "many other factors, such as delay, bad faith, or futility of the amendment, may weigh against the trial court's allowing amendment." *Aurora Credit Servs., Inc. v. Liberty W. Dev., Inc.,* 970 P.2d 1273, 1282 (Utah 1998).

¶ 59 In this case, the trial court found the motion to amend both untimely and prejudicial. Untimely motions are those "filed in the advanced procedural stages of the litigation process." *Kelly,* 2004 UT App 44, ¶ 29, 87 P.3d 734. Motions are prejudicial when the nonmoving party would have little time to prepare a response before trial. *Swan Creek Vill. Homeowners Ass'n v. Warne,* 2006 UT 22, ¶ 21, 134 P.3d 1122. The trial court found the motion both untimely and prejudicial because Mr. Daniels had all the information to include the fraudulent concealment claim in his first amended complaint in December 2006 and chose not to do so.

¶ 60 Mr. Daniels argues that the trial court should have granted his motion because the Defendants were aware that Mr. Daniels might add a fraudulent concealment claim in August 2006. Although Defendants had notice, Mr. Daniels did not actually move to add fraudulent concealment until eleven months later, during which time the period for fact discovery had expired and Mr. Daniels had already amended his complaint. His motion was untimely, and reopening discovery would have caused delay. We do acknowledge, however, that the trial date was distant and that the Defendants might have had sufficient time to prepare a response to the claim of fraudulent concealment. But "we give considerable deference to the district court, as it is 'best positioned to evaluate the motion to amend in the context of the scope and duration of the lawsuit,'" *id.* ¶ 19 (quoting *Smith v. Grand Canyon Expeditions Co.,* 2003 UT 57, ¶ 32, 84 P.3d 1154), and defer to the trial court's determination that the additional claim would have prejudiced the Defendants. We hold, therefore, that the trial court did not abuse its discretion in denying Mr. Daniels's motion to amend.

## CONCLUSION

¶ 61 We hold that the jury instructions provided by the trial court were in error because the Health Care Malpractice Act statute of limitations does not begin to run until a plaintiff discovers the negligence—including its causal event—that may have caused his injury. We therefore vacate the jury verdict. We also reverse the admission of Mr. Daniels's superseded complaint, which the trial court determined was relevant based on its erroneous interpretation of the discovery rule is also reversed. Further, upon our review of the facts presented, we see no reason to continue to bifurcate the

trial and encourage the court and parties to move forward to a trial on the merits and consider any remaining statute of limitations defenses at that time.

¶ 62 Additionally, we hold the trial court did not abuse its discretion by excluding evidence that testifying witnesses and the Defendants were covered by the same insurance provider because the plaintiff failed to show a substantial connection between the testifying witnesses and the insurance provider. Mr. Daniels did not preserve his argument that the jury should have been screened for connections to the insurance industry. Further, we hold that gross negligence may support a claim for punitive damages when the negligence was both knowing and reckless. We also hold that a plaintiff may allege breach of fiduciary duties against his physician, so long as those claims are not abrogated by statute, such as the duty to disclose the risks inherent to a medical procedure. Finally, we hold that the district court did not abuse its discretion in granting the Defendants' motion to strike supplemental expert witness testimony and in denying a motion to amend that it found to be untimely. Therefore, we affirm in part and reverse in part, and we remand the case to the trial court for proceedings consistent with this opinion.

¶ 63 Associate Chief Justice DURRANT, Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Chief Justice DURHAM's opinion.