**2016 UT App 176**

## THE UTAH COURT OF APPEALS

RODOLFO MARTINEZ-FERRATE,
Petitioner,

*v.*

DEPARTMENT OF COMMERCE, DIVISION OF OCCUPATIONAL AND
PROFESSIONAL LICENSING,
Respondent.

Opinion
No. 20150062-CA
Filed August 18, 2016

Original Proceeding in this Court

Harold L. Reiser, Bradley Strassberg, Adam H.
Reiser, and Kimberley L. Hansen, Attorneys
for Petitioner

Sean D. Reyes, Brent A. Burnett, Nancy L. Kemp, and
Laurie L. Noda, Attorneys for Respondent

JUDGE MICHELE M. CHRISTIANSEN authored this Opinion, in
which JUDGE J. FREDERIC VOROS JR. and SENIOR JUDGE PAMELA T.
GREENWOOD concurred.[1]

CHRISTIANSEN, Judge:

¶1     Dr. Rodolfo Martinez-Ferrate challenges the findings of
fact, conclusions of law, and order entered by the Division of
Occupational and Professional Licensing (DOPL) as amended
and adopted by the Utah Department of Commerce (the
Amended Order). The Amended Order issued a sanction of

---

1. Senior Judge Pamela T. Greenwood sat by special assignment
as authorized by law. *See generally* Utah R. Jud. Admin. 11-
201(6).

probation against Dr. Ferrate's[2] licenses to practice as a physician and surgeon and to administer and prescribe controlled substances.[3] We do not disturb the Amended Order.

BACKGROUND

¶2 The Utah Physicians Licensing Board (the Board), under the auspices of DOPL, entered findings of fact that were amended and adopted by the Department of Commerce (the Department). We recite the facts as adopted.

¶3 Dr. Ferrate operated a small, independent family practice with an emphasis on treating sleep disorders. On occasion, Dr. Ferrate used infrared therapy to promote cell regeneration and encourage overall healing. Dr. Ferrate administered this therapy using an infrared device he had received from an acquaintance. The device was not tested or approved by any regulatory agency or industry body for use or sale within the United States; however, the record is insufficient to establish whether any regulations required such testing and approval.

¶4 Dr. Ferrate allowed Cory Bradshaw access to his clinic and to his patients. Bradshaw was not employed by Dr. Ferrate, possessed no relevant licenses, and had received no formal

_____

2. The record and briefing on appeal consistently refer to "Dr. Ferrate" and we follow their lead.

3. Dr. Ferrate has since satisfied the conditions of the Amended Order's probation and his licenses have been reinstated as of January 12, 2016. Dr. Ferrate explains that reinstatement does not moot his challenge seeking vacatur of the findings of fact and conclusions of law in the Amended Order due to collateral consequences. The Department of Commerce does not take issue with this explanation.

medical training in nutrition. Despite being aware of these shortcomings, Dr. Ferrate considered Bradshaw a nutrition expert and introduced her to his patients as such. Dr. Ferrate understood and endorsed Bradshaw's approach to natural healing, which generally advocated a diet of raw food, fermented food, and so-called "live food." Dr. Ferrate allowed Bradshaw to access his electronic record-keeping system and to enter notes into patient charts; there was no way to clearly distinguish her notes from his. Bradshaw had some general experience with infrared devices but had not received any training from Dr. Ferrate relating to the infrared device used in his clinic.

¶5     On June 22, 2012, Patient Doe visited Dr. Ferrate for an initial consultation regarding neuropathy of her feet. Dr. Ferrate did not yet have Patient Doe's medical records and did not conduct an examination to determine the nature and extent of the neuropathy. At the consultation, Dr. Ferrate discussed using infrared therapy to treat Patient Doe's neuropathy.

¶6     On June 26, 2012, Patient Doe returned to the clinic to begin infrared therapy on her feet. While Bradshaw was in the room, Dr. Ferrate discussed using the infrared device over Patient Doe's abdomen to target her liver area for general health. Patient Doe understood that the device would be used to target her liver. Dr. Ferrate positioned the infrared device over Patient Doe's feet and then left the room, leaving Patient Doe with Bradshaw.

¶7     Bradshaw then repositioned the infrared device over Patient Doe's abdomen. Although the device was not designed to be used through clothing, Bradshaw did not ask or instruct Patient Doe to remove her clothing. Bradshaw activated the device, causing Patient Doe to express her discomfort. Patient Doe did not ask to see Dr. Ferrate or to pause the treatment.

When Dr. Ferrate returned to the room, he stopped the treatment. Patient Doe then left the clinic.

¶8    Later that day, Patient Doe called the clinic to inform Dr. Ferrate that her abdomen appeared to have been burned. Dr. Ferrate asked her to return to the clinic, where he prescribed silver sulfadiazine to treat the burns. Patient Doe was eventually treated by a different physician for what turned out to be second-degree burns to her abdomen, and now has residual scarring.

¶9    The clinic's notes regarding this incident included an entry by Bradshaw, claiming that she asked Patient Doe to remove clothing from her abdominal area and that Patient Doe refused. The Board determined that this statement was false. The notes also included an entry by Dr. Ferrate stating that he had explained to Patient Doe the risk of the infrared device generating heat. The Board determined that this statement was also false. Finally, Dr. Ferrate also entered a note that "[n]utrition staff decided to initiate treatment in abd[ominal] area on her own with clothing not following our clinic protocol."

¶10    Dr. Ferrate acknowledged liability for Patient Doe's injury and financially compensated her for it. He has stopped using the infrared device and no longer allows Bradshaw to assist him with patient counseling or treatment.

¶11    The Utah Physicians Licensing Board convened to review this incident and to determine what action to take. The Board noted that, under Utah Administrative Code R156-67-102(2), an "alternate medical practice" is one that is not generally recognized as standard in the practice of medicine. The Board further noted that a physician may employ alternate medical practices so long as (1) the alternate medical practices are not shown by generally accepted medical evidence to present a greater risk to the patient than the standard treatments and (2) current generally accepted documentation demonstrates that

the alternate medical practice has a reasonable potential to be of benefit.

¶12   The Board found that the "use of infrared therapy to treat neuropathy of the feet constitutes alternate medical practice because it is not generally recognized as the standard of treatment." Because "heat therapies should not pose any meaningful risk to the health, safety, or welfare of a patient," "infrared therapy, when used properly and carefully, is an acceptable alternate medical practice for treating neuropathy." However, the "use of infrared therapy to promote overall general health by exposure to a large area of the body," such as "the abdominal area over or near the liver," "does not qualify as an acceptable alternate medical practice for the promotion of general good health." The Board explained, "Where [Dr. Ferrate] has not specified a clear treatment objective for his use of infrared therapy over an area that is not affected by injury or disease, it is difficult for the Board to specify the standard of treatment that would apply. However, overall good health is generally promoted through diet and exercise. [Dr. Ferrate] has provided no literature to establish that infrared therapy replaces or complements a healthy lifestyle, and the Board is aware of none."

¶13   The Board concluded that Dr. Ferrate's use of infrared therapy for the promotion of general health violated Utah Administrative Code R156-67-502(14), which prohibits the use of an alternate medical practice absent generally accepted documentation establishing that the practice has a reasonable potential to be of benefit, and therefore that it amounted to unprofessional conduct pursuant to Utah Code section 58-1-501(2)(a).[4] The Board also concluded that Dr. Ferrate had

---

4. "'Unprofessional conduct' means conduct, by a licensee or applicant, that is defined as unprofessional conduct under this

(continued…)

violated section 501(2)(a) a second time by failing to set clear limits and boundaries for Bradshaw and to ensure her compliance therewith. The Board further concluded that Dr. Ferrate had violated section 501(2)(a) a third time by failing to provide Patient Doe with a written disclosure as to the potential risks and benefits of the alternate medical procedure, as required by Utah Administrative Code R156-67-603(1)(c).

¶14    The Board next concluded that Dr. Ferrate had committed gross negligence pursuant to section 501(2)(g). Specifically, the Board explained that Dr. Ferrate had chosen to employ an alternative medical practice on Patient Doe's abdomen "for no documented or documentable medical reason and without proper disclosure to, or prior education of, the patient."[5] The Board noted that Dr. Ferrate had decided on this course of action even though he had not physically examined Patient Doe or reviewed her medical records to determine whether the use of heat would pose unusual risks in her specific circumstances. The Board also explained that Dr. Ferrate had "chose[n] to leave Patient Doe under the infrared heat device while attended only by Ms. Bradshaw," who Dr. Ferrate had reason to know "did not acknowledge her own limitations and could not be trusted to confine her activities accordingly." The Board further explained

---

(…continued)
title or under any rule adopted under this title and includes: (a) violating, or aiding or abetting any other person to violate, any statute, rule, or order regulating an occupation or profession under this title[.]" Utah Code Ann. § 58-1-501(2) (LexisNexis 2012).

5. While Dr. Ferrate did not initiate such treatment himself, he discussed using the infrared device on Patient Doe's liver and, by the time Dr. Ferrate left the room, Patient Doe understood that the device would be used to treat her liver at some point.

that Dr. Ferrate chose to employ a "largely undocumented and untested" infrared device, without guidance from the manufacturer. The Board noted that Dr. Ferrate's negligence was "further demonstrated by his failure to accurately document his treatment of Patient Doe"; his decision to allow Bradshaw, "a non-employee with no medical training," to write and modify patient records; and his failure to properly use record-keeping software, with the result that "the dates noted in Patient Doe's treatment chart are incorrect and misleading."

¶15 Because Dr. Ferrate acknowledged liability for Patient Doe's injury, took preventative measures such as ending his association with Bradshaw and returning the infrared device, and had no previous similar incidents, the Board recommended that DOPL place Dr. Ferrate's licenses on probation rather than revoking or suspending them. DOPL did so, and the executive director of the Department affirmed that recommendation in the Amended Order.

ISSUES AND STANDARDS OF REVIEW

¶16 Dr. Ferrate challenges the Board's order on a number of grounds. First, he contends that he was denied due process when a recording of Bradshaw's unsworn statements was played at the hearing without Bradshaw being present to be cross-examined. Second, he contends that the Board improperly concluded that he was grossly negligent for using the infrared device over Patient Doe's abdomen when the Board also recognized that it was Bradshaw who repositioned the device from Patient Doe's feet to her abdomen. Third, Dr. Ferrate contends that the Amended Order's conclusions of law are not "supported in light of the whole record and Utah law." Fourth, Dr. Ferrate contends that the Board improperly applied Utah law in concluding that he was grossly negligent. Fifth, Dr. Ferrate contends that the Board misinterpreted a portion of the American Medical Association (the AMA) Code of Medical

Ethics. Sixth, Dr. Ferrate contends that the Amended Order "is not supported by substantial evidence or consistent with applicable law when viewed in light of the whole record before [DOPL]." Seventh, Dr. Ferrate contends that the Board's order "is an abuse of discretion and is contrary to and in violation of the rules, practices and procedure of [DOPL]."

¶17    It is not the role of a reviewing court to second-guess an agency's decision; rather, we owe substantial deference to the agency's decision so long as the agency applied the correct legal standard to facts supported by substantial record evidence. *See* Utah Code Ann. § 63G-4-403(4) (LexisNexis 2014) (restricting a reviewing court's ability to grant relief). We review an agency's application of a given legal standard to a unique set of facts with substantial deference. *Decker Lake Ventures, LLC v. Utah State Tax Comm'n*, 2015 UT 66, ¶ 15, 356 P.3d 1243. We review the agency's interpretation of a legal standard for correctness. *See Murray v. Labor Comm'n*, 2013 UT 38, ¶¶ 21–22, 308 P.3d 461. And we review the agency's findings of fact only to ascertain whether they are supported by "substantial evidence when viewed in light of the whole record before the court." *See* Utah Code Ann. § 63G-4-403(4)(g).

## ANALYSIS[6]

¶18    Rule 24 of the Utah Rules of Appellate Procedure governs the content and form of briefs filed in this court. Rule 24(a)(5)

---

6. Although we occasionally refer to the Board's findings and conclusions to match the parties' briefing and for the reader's convenience, we clarify that we mean the Board's findings and conclusions as adopted by the Department. *See FirstDigital Telecom, LLC v. Procurement Policy Board*, 2015 UT App 47, ¶ 10 n.1, 345 P.3d 767 (explaining that this court's review is limited to the final agency action).

requires an opening brief to contain "[a] statement of the issues presented for review, including for each issue: the standard of appellate review with supporting authority." *See* Utah R. App. P. 24(a)(5). Dr. Ferrate has failed to identify the standard of review applicable to each of the issues presented for review. Furthermore, "[i]ssues not raised in proceedings before administrative agencies are not subject to judicial review except under exceptional circumstances." *Speirs v. Southern Utah Univ.*, 2002 UT App 389, ¶ 12 n.5, 60 P.3d 42; *see also Brinkerhoff v. Schwendiman*, 790 P.2d 587, 589 (Utah Ct. App. 1990) (noting that, in the context of judicial review of an administrative hearing, a party must raise an objection in the earlier proceeding to avoid waiving its right to litigate the issue in subsequent proceedings). Because Dr. Ferrate has failed to identify the standard of review for each issue and has failed to provide citation to the record demonstrating that the issues he raises were preserved for judicial review, we reject all of his contentions. *See Sivulich v. Department of Workforce Servs.*, 2015 UT App 101, ¶ 5, 348 P.3d 748 (observing that when the petition fails to cite the record to identify where the issues presented for judicial review were preserved, "the task of combing through the record is improperly left to this court"). However, Dr. Ferrate's contentions also fail on their merits, as we explain below.

¶19 The Department concedes that three of the issues were at least partially preserved for judicial review; we commend the Department's counsel for their candor and thoroughness in partially carrying Dr. Ferrate's burden on appeal. These issues are whether the Department appropriately concluded (1) that Dr. Ferrate used the infrared device in a grossly negligent manner despite the Department finding that the device was repositioned and activated by Bradshaw, (2) that Dr. Ferrate violated his ethical duties under the AMA's Code of Medical Ethics by failing to properly supervise Bradshaw, and (3) that Dr. Ferrate committed gross negligence despite the Department failing to find that Dr. Ferrate was indifferent to Patient Doe's well-being.

We also address Dr. Ferrate's contention that the introduction of Bradshaw's previously recorded statements violated his due process rights.

## I. Due Process

¶20    Dr. Ferrate first contends that the Department violated his due process rights when it adopted the Board's findings and conclusions despite the Board having heard only recordings of Bradshaw and not live testimony. Dr. Ferrate argues that the introduction of Bradshaw's statements violated Utah Code section 63G-4-206, which requires the presiding officer at a formal adjudicative proceeding to "afford to all parties the opportunity to . . . conduct cross-examination." *See* Utah Code Ann. § 63G-4-206(1)(d) (LexisNexis 2014). The Department responds that this issue is moot because none of the findings or conclusions of the Amended Order were based on evidence from Bradshaw's recorded statements.

¶21    The Department's Amended Order acknowledged that "it was improper to admit the recording of Ms. Bradshaw's interview . . . as [Dr. Ferrate] had no opportunity to cross-examine Ms. Bradshaw." The Department nonetheless ruled that Dr. Ferrate had failed to establish prejudice because "[a] review of the record and [DOPL's order] indicates that [DOPL's] findings and conclusions were based on evidence independent of Cory Bradshaw's interview." The Department then set forth the evidence presented at the hearing and noted the absence of any finding based on Bradshaw's claims that she was an employee or that she had been instructed by Dr. Ferrate to reposition the infrared device. As a result, the Department adopted the Board's findings, with one exception not relevant here.

¶22    Dr. Ferrate's opening brief makes no effort to explain how the Department's no-prejudice conclusion was erroneous. Rather, he simply asserts in conclusory fashion that because the

Board erred by admitting Bradshaw's statements, he was prejudiced. In his reply brief, Dr. Ferrate asserts, "Simply stating that [the Department] ruled it was not prejudicial does not make the ruling correct. The very point of an appeal is to test the correctness of the lower court's ruling." We agree with Dr. Ferrate on this point; however, *he* bears the burden of proving prejudice in order to demonstrate error in the Department's no-prejudice conclusion. *See Sivulich v. Department of Workforce Servs.*, 2015 UT App 101, ¶ 5, 348 P.3d 748 (explaining that a reviewing court "is not a depository in which a party may dump the burden of argument and research" (brackets, citation, and internal quotation marks omitted)).

¶23　Dr. Ferrate's reply brief first argues that prejudice is automatic when the petitioner is unable to cross-examine a witness in an administrative hearing. But the cases he relies on state only that prejudice arose under the specific circumstances of those cases. *See, e.g.*, *D.B. v. Department of Business Regulation*, 779 P.2d 1145, 1149 (Utah Ct. App. 1989) (holding that, where D.B.'s professional license was revoked after allegations of abuse and the administrative law judge did not offer D.B. the opportunity to cross-examine any of the three witnesses present at the hearing, "the hearing given to D.B. lacked the due process of law required by law, was unfair, and constitute[d] 'substantial prejudice' to him"). Dr. Ferrate next asserts, "The fact that other evidence may have been considered by the Board and [the Department] in rendering their rulings does not diminish the prejudice infused by Ms. Bradshaw's improper testimony." But Dr. Ferrate provides no authority for this assertion and has not proven that any actual prejudice existed in the first place, especially where Bradshaw did not appear at the hearing and DOPL's findings were not based on her recorded interview.

¶24　Dr. Ferrate also argues that "the Board and [the Department's] conclusion that Dr. Ferrate partnered with Ms. Bradshaw was colored by Ms. Bradshaw's own testimony

regarding her relationship with Dr. Ferrate." It is true that the Board found that Dr. Ferrate "partnered with Cory Bradshaw." However, the same finding explained that Bradshaw was not employed by Dr. Ferrate's clinic or otherwise paid for her work. When read in context, it is clear that the Board was not imputing any legal partnership between the two individuals; instead, the Board used the word "partner" to describe Bradshaw's non-employee role in the clinic. In any event, even if the Board had improperly imputed a legal partnership between Dr. Ferrate and Bradshaw, that imputation did not prejudice Dr. Ferrate. The Board did not conclude that Dr. Ferrate was grossly negligent due to any legal partnership with Bradshaw, but rather because he allowed Bradshaw largely unfettered access to his clinic, his patients, and his patient records. Similarly, he did not suffer prejudice from a possible inference that Bradshaw claimed Dr. Ferrate instructed her to place the infrared device on Patient Doe's abdomen, because the Board did not find that he had done so. Moreover, the Board's gross-negligence conclusion was not based on what it determined Dr. Ferrate had instructed Bradshaw to do; that conclusion was based on Dr. Ferrate's lack of oversight of Bradshaw and lack of instruction to her.

¶25 Dr. Ferrate has therefore failed to carry his burden of demonstrating error in the Department's conclusion that he was not prejudiced by the Board's erroneous admission of Bradshaw's recorded statements.

## II. Findings to Support the Conclusion of Gross Negligence

¶26 Dr. Ferrate contends that the Board's statements regarding his indifference and intentions do not adequately support its conclusion that he was grossly negligent.

¶27 The core of this claim is that the Department "erroneously interpreted or applied the law" to the facts it found. *See* Utah Code Ann. § 63G-4-403(4)(d) (LexisNexis 2014). "Determining whether a professional has practiced incompetently" or with

gross negligence "is an intensely fact-specific inquiry," *Taylor v. Department of Commerce*, 952 P.2d 1090, 1092 (Utah Ct. App. 1998), and we therefore review for an abuse of discretion the Department's application of the gross-negligence standard to the facts it found, *Cook v. Department of Commerce*, 2015 UT App 64, ¶ 20, 347 P.3d 5.

¶28 Dr. Ferrate notes that Utah courts have defined gross negligence as "the failure to observe even slight care; it is carelessness or recklessness to a degree that shows utter indifference to the consequences that may result." *See Daniels v. Gamma West Brachytherapy, LLC*, 2009 UT 66, ¶ 43, 221 P.3d 256 (citation and internal quotation marks omitted). He asserts that gross negligence must be proven by clear and convincing evidence because "'[w]hile all gross negligence claimants can automatically claim recklessness, only some may be able to show that a tortfeasor actually knew of the danger of his or her action or inaction.'" (Quoting *Daniels*, 2009 UT 66, ¶ 44.) On this basis, Dr. Ferrate argues that the Board's statements that it "does not find or imply that [Dr. Ferrate] was indifferent to Patient Doe's well being" and that "[t]he Board accepts that [Dr. Ferrate] had good intentions," are incompatible with the conclusion that he was grossly negligent.[7]

¶29 However, the quoted section of *Daniels* addressed the circumstances under which a physician's gross negligence could give rise to punitive damages. *See Daniels*, 2009 UT 66, ¶ 41 (explaining that Utah Code section 78B-8-201 "allows punitive damages to be awarded only if . . . it is established by clear and convincing evidence that the acts or omissions of the tortfeasor are the result of willful and malicious or intentionally fraudulent

---

7. Dr. Ferrate ignores the remainder of the paragraph, in which the Board stated that "[Dr. Ferrate] was indifferent to the potential negative consequences of his decisions and actions."

conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others" (citation and internal quotation marks omitted) (ellipsis in original)). The correct standard for reviewing an agency's factual finding is whether the finding is "supported by substantial evidence when viewed in light of the whole record before the court." *See* Utah Code Ann. § 63G-4-403(4)(g).

¶30    Applying this standard to the Amended Order, we see no irreconcilable conflict between the Board's statements and its gross-negligence conclusion. Substantial evidence supporting the Board's conclusion included Dr. Ferrate's decision to treat Patient Doe's general health and neuropathy of her feet with infrared treatment without first examining her or her medical records.[8] It also included the false statements entered into Patient Doe's medical record and Dr. Ferrate's failure to provide Patient Doe with any written documentation regarding infrared therapy. Moreover, the Board's statements that Dr. Ferrate had good intentions and that the Board did not find or imply that Dr. Ferrate was indifferent to Patient Doe's well-being shed no light on whether he acted with gross negligence. Indeed, physicians can be concerned with a patient's overall well-being yet still be grossly negligent in the application of specific treatments or procedures to that patient.

---

8. Dr. Ferrate argues that these failures were not properly before the Board because they were not pleaded in the petition. However, as the Department noted, the petition alleged that Dr. Ferrate, in an interview with DOPL's investigator, "stated that he did not do any testing of Patient Doe" and "said he did not review her medical records," relying instead on her verbal report. We conclude that the failures to examine and to review medical records were properly before the Board.

¶31    Dr. Ferrate also states that "'negligence, by definition, consists of conduct where the tortfeasor does not intend to cause harm.'" (Quoting *Daniels*, 2009 UT 66, ¶ 41.) He notes that the Board "accept[ed] and credit[ed]" Patient Doe's testimony that she "accept[ed] the circumstances as unintentional and accidental." Dr. Ferrate then asserts that because the Board accepted Patient Doe's statement that she "felt that Dr. Ferrate had not done it on purpose," the Board could not have properly found him negligent. But Patient Doe's belief, whether accurate or not, that Dr. Ferrate had not acted intentionally is perfectly consistent with negligence, i.e., "conduct where the tortfeasor does not intend to cause harm." *See Daniels*, 2009 UT 66, ¶ 41. Accordingly, we reject this argument.

### III. Paragraph Thirty-Five

¶32    Dr. Ferrate next contends that the Board's statements in paragraph thirty-five of the Amended Order were not supported by substantial evidence. He takes issue with the Board's statement that "Ms. Bradshaw had no formal medical training but, to all appearances, was nevertheless confident enough in her own abilities and sensibilities that she independently counseled patients in a manner that might induce them to discontinue medications and for[]go treatment plans prescribed for them by licensed physicians." He argues that the finding that Bradshaw advocated a diet of raw food, live food, and fermented food, "which she maintained would allow many patients to transition off medication and heal naturally," was insufficient to support the Board's statement.

¶33    Essentially, Dr. Ferrate asserts that it was inappropriate for the Board to conclude that he should have anticipated that Bradshaw would take "Patient Doe's treatment into her own hands." But this presupposes that the Board's conclusion was based solely on the single finding recited by Dr. Ferrate. As we have explained, we are required to consider whether an agency's

finding is "supported by substantial evidence when viewed in light of the whole record before the court." *See* Utah Code Ann. § 63G-4-403(4)(g). In addition to the finding he identifies, the evidence before the Board also included Dr. Ferrate's admissions that he knew Bradshaw personally owned two infrared machines, had nine years of experience with them, and professed to be comfortable using them. When combined with the substantial degree of freedom Dr. Ferrate allowed Bradshaw, including entering her own patient notes and counseling patients at least about their diets, we cannot say that the agency's finding was not supported by substantial evidence.

IV. Negligent Supervision

¶34    Dr. Ferrate also contends that the Board erred in determining that his supervision of Bradshaw was negligent. He compares Bradshaw's presence to that of prospective medical students.[9] Dr. Ferrate argues that prospective students often shadow practicing physicians and that leaving them with patients is not negligent. But he does not cite any authority or record support for these assertions. Moreover, Dr. Ferrate does not claim that prospective medical students are regularly given free access to enter patient records, that they are afforded time alone with patients to discuss treatments, or that supervising physicians do not admonish them to avoid independently counseling or treating patients. As a result, Dr. Ferrate has not shown that the Board's application of the negligence standard to the unique facts of his case constituted an abuse of discretion. *See Decker Lake Ventures, LLC v. Utah State Tax Comm'n*, 2015 UT 66, ¶ 12, 356 P.3d 1234.

---

9. Nothing in the record suggests, and Dr. Ferrate does not claim, that Bradshaw was a prospective medical student.

¶35 Dr. Ferrate next raises several arguments to the effect that he was not supervising Bradshaw. Specifically, Dr. Ferrate challenges the Board's finding that he partnered with Bradshaw. However, as discussed above, it is clear from the record that the Board was not imputing any sort of legal partnership to Dr. Ferrate and Bradshaw but rather attempting to describe Dr. Ferrate's decision to allow Bradshaw to function without pay in his clinic with access to his patients and his patient records. Because the Board did not find a legal partnership existed, Dr. Ferrate's challenge fails.

¶36 Dr. Ferrate argues that Bradshaw was not employed by his clinic and was acting outside his control and supervision. But Dr. Ferrate allowed Bradshaw to function in his clinic, counsel his patients, and make entries in his patient records. If she were not actually supervised by Dr. Ferrate, that would be prima facie evidence of negligent supervision given the role he allowed her to assume. For the same reason, Dr. Ferrate's arguments regarding the retained-control doctrine also fail.

¶37 In any event, Dr. Ferrate's responsibilities did not arise from any employment of Bradshaw. Rather, section 58-67-502 of the Utah Code required him to ensure that Bradshaw was properly trained before allowing her to function within his clinic. Section 502 provides that a licensed physician's conduct is unprofessional when, among other things, he or she uses or employs "the services of any individual to assist a licensee in any manner not in accordance with the generally recognized practices, standards, or ethics of the profession, state law, or division rule." Utah Code Ann. § 58-67-502(1)(a) (LexisNexis 2012). Utah Administrative Code R156-67-502(15) provides that these standards incorporate "any provision of the [AMA's] 'Code of Medical Ethics.'" The AMA's Code of Medical Ethics includes Opinion 3.03, which provides that "[i]t is ethical for a physician to work in consultation with . . . allied health professionals, as long as they are appropriately trained and duly

licensed to perform the activities being requested." *See* Opinion 3.03 – Allied Health Professionals, http://www.ama-assn.org /ama/pub/physician-resources/medical-ethics/code-medical-ethics/opinion303.page [https://perma.cc/6U4C-DB7H]. Dr. Ferrate did not ensure that Bradshaw was appropriately trained, let alone licensed, before allowing her to "generally participate as one of his health care team" and to access and modify his patient records.

¶38 We readily conclude that the Board did not abuse its discretion in determining that Dr. Ferrate negligently failed to properly supervise his clinic. *See Cook v. Department of Commerce*, 2015 UT App 64, ¶ 20, 347 P.3d 5; *Taylor v. Department of Commerce*, 952 P.2d 1090, 1092 (Utah Ct. App. 1998).

## V. Gross Negligence in Treatment

¶39 Finally, Dr. Ferrate contends that the Board incorrectly concluded that he was grossly negligent with respect to Patient Doe's treatment. Dr. Ferrate notes that the Board found that Bradshaw had repositioned the infrared device over Patient Doe's abdomen, and asserts that he only discussed the possibility of using the device on Patient Doe's abdomen. He argues that it was therefore inappropriate for the Board to conclude that he was grossly negligent for treating Patient Doe's abdomen with the infrared device.

¶40 Dr. Ferrate misses the gravamen of the Board's conclusions. The Board concluded that he was grossly negligent not for employing the infrared device himself but for allowing Bradshaw the opportunity to do so despite the warning signs discussed above, especially in light of the free run of the clinic he had allowed her. In any event, Patient Doe testified that she understood from Dr. Ferrate that the infrared device would be used on her abdomen for general good health as well as on her feet for neuropathy. The Board found that infrared therapy, while an acceptable alternate medical practice to treat

neuropathy of the feet, was not an acceptable alternate medical practice to treat an uninjured and disease-free area simply to promote general good health. The Board therefore concluded that Dr. Ferrate's plan to use infrared therapy on Patient Doe's abdomen to promote general good health amounted to unprofessional conduct—regardless of whether Bradshaw jumped the gun and began treating Patient Doe independently.

## CONCLUSION

¶41 Dr. Ferrate has failed to demonstrate that any of his contentions were preserved in the proceedings below; accordingly, he has waived them. Moreover, those contentions also fail on their merits.

¶42 For the foregoing reasons, we do not disturb the Amended Order.

———————