**2020 UT App 143**

## THE UTAH COURT OF APPEALS

JOHN ZENDLER AND DEBORAH ZENDLER,
Appellants,
*v.*
UNIVERSITY OF UTAH HEALTH CARE, UNIVERSITY OF UTAH
HOSPITAL, UNIVERSITY HOSPITAL, UNIVERSITY OF UTAH HEALTH
SCIENCES CENTER, AND STATE OF UTAH,
Appellees.

Opinion
No. 20190512-CA
Filed October 22, 2020

Third District Court, Salt Lake Department
The Honorable Robert P. Faust
No. 160907183

Melvin C. Orchard III and Jessica A. Andrew,
Attorneys for Appellants

Terence L. Rooney and J. Adam Sorenson, Attorneys
for Appellees

JUDGE KATE APPLEBY authored this Opinion, in which
JUDGES GREGORY K. ORME and MICHELE M. CHRISTIANSEN
FORSTER concurred.

APPLEBY, Judge:

¶1      John Zendler received a right knee replacement at the University of Utah Hospital in June 2015. After surgery, Zendler experienced multiple complications, including a serious infection, which ultimately necessitated amputation of his right leg. Zendler and his wife, Deborah Zendler (collectively, Plaintiffs), sued the University of Utah Health Care, the University of Utah Hospital, the University Hospital, the University of Utah Health Sciences Center, and the State of Utah (collectively, Defendants) seeking damages. Following

consideration of various motions, the district court entered summary judgment in favor of Defendants. Plaintiffs appeal, and we affirm.

## BACKGROUND[1]

¶2    In December 2014, Zendler consulted with a doctor (Utah Doctor) at the University of Utah Orthopedic Center concerning chronic right knee pain. Based on his symptoms, Utah Doctor determined Zendler was a candidate for "total knee replacement surgery of his right knee." Utah Doctor informed Zendler that "knee replacement surgery carries with it several significant and substantial risks, including (1) infection requiring further surgery or removal of implants; (2) massive infection requiring amputation; and (3) life-threatening complications including stroke, clot, heart attack, pulmonary embolism and death." (Quotation simplified.) Despite knowing these risks, Zendler scheduled the elective surgery with Utah Doctor for June 2015, at the University of Utah Hospital (the Hospital).

¶3    Between Zendler's consultation with Utah Doctor in December and the date of his surgery, Zendler developed swelling in his non-operative left leg. Zendler visited three physicians in his hometown in Wyoming. Those physicians diagnosed him with lymphedema.[2]

---

1. When reviewing a grant of summary judgment, we view the facts and all reasonable inferences in the light most favorable to the nonmoving parties. *Anderson Dev. Co. v. Tobias*, 2005 UT 36, ¶ 31, 116 P.3d 323.

2. According to Plaintiffs, "[l]ymphedema compromises the body's ability to heal and fight infection, significantly increasing a surgical patient's risk of post-surgical infection and associated

(continued…)

¶4    About one week before his scheduled surgery, the lymphedema symptoms in Zendler's left leg intensified; his leg became "very painful and extremely swollen, with pain extend[ing] up [his] leg and into his groin." Concerned by these new symptoms, Zendler tried several times over the next few days to contact Utah Doctor to discuss whether it was safe to proceed with the scheduled surgery because of the lymphedema in his non-operative leg. On Saturday, May 30, 2015, three days before the surgery, Zendler spoke with Utah Doctor's nurse, who told him Utah Doctor recommended he postpone the surgery until the lymphedema resolved. The nurse also informed Zendler she would contact his hometown physician on Monday to obtain information about his lymphedema testing. Utah Doctor would then review the results and determine whether to conduct a physical examination of Zendler's leg that day, but in the meantime, Zendler could "plan to proceed with surgery," and if the lymphedema was too serious to proceed, the surgery would be cancelled at that time.

¶5    Utah Doctor's office obtained and reviewed Zendler's medical records from his hometown physician. At that time, Utah Doctor elected not to conduct a physical examination of Zendler and instead determined to proceed with surgery. The following day, on June 2, 2015, Zendler underwent a right knee replacement at the Hospital. Before surgery, Zendler was again informed of the risks of the procedure, including, as relevant here, the risks of "nonhealing of the tissues and need for reoperation, . . . infection requiring further surgery or removal of implants, massive infection requiring amputation, or continued or worse pain." Having been informed of these risks, Zendler then signed a consent form for the surgery.

---

(…continued)

complications. It causes infections to spread, persist[,] and be more severe."

¶6    After surgery, Zendler was discharged from the Hospital and returned home to Wyoming. He soon began experiencing symptoms of infection and was eventually readmitted to the Hospital on June 20, 2015, where he was diagnosed with "right total knee periprosthetic joint infection" (the first infection). While at the Hospital, Zendler's infection was treated by Utah Doctor, who performed a "right knee irrigation and debridement." The consulting infectious disease specialists at the Hospital, in conjunction with Utah Doctor, also prescribed a six-month course of antibiotics to treat the infection. On June 25, 2015, Zendler was again discharged from the Hospital.

¶7    In July 2015, Zendler began care with a doctor in Wyoming (Wyoming Doctor). The following month, Wyoming Doctor noted Zendler's infected right knee was not causing Zendler "fevers, chills, [or] sweats," he had "returned to work part time," and he was experiencing only minimal pain, for which he did not take any medication.

¶8    On September 9, 2015, Plaintiffs expressed a desire to Wyoming Doctor to improve the range of motion in Zendler's right knee. Wyoming Doctor explained that if the knee infection was not cured and the antibiotics were extended for another four months, the delay would "limit the ability for [Zendler] to get his range of motion back." Wyoming Doctor then proposed Zendler "abstain from the antibiotics for several weeks, re-aspirate the knee and see if it is still infected." If the infection was eradicated, Wyoming Doctor would perform a revision knee replacement of Zendler's right knee at that time. Wyoming Doctor further explained that although surgery could improve Zendler's range of motion in his right knee by "a few more degrees," the range could also "get worse."

¶9    The following week, Wyoming Doctor noted Zendler looked better "than he has for quite some time since the onset of his infection." Specifically, there was a "mild improvement of his

lymphedema, no fevers, chills or sweats," and his incision had improved with the wound width decreasing. Wyoming Doctor and Plaintiffs again discussed stopping the course of antibiotics prescribed by Utah Doctor, ultimately concluding Zendler would "cease all antibiotics" and Wyoming Doctor would "re-evaluate him in three weeks, re-aspirate the joint to check for evidence of recurrent infection and then talk about further options regarding his arthrofibrosis."

¶10 Zendler stopped all antibiotics, as discussed, and Wyoming Doctor took cultures of Zendler's knee, one in October 2015 and one in November 2015. Both cultures were "negative for infection," and Wyoming Doctor proceeded to surgery.

¶11 On December 3, 2015, Wyoming Doctor performed surgery on Zendler's right knee. Before surgery, Wyoming Doctor examined Zendler, noting the infection in his right knee "ha[d] resolved" and the "oblique incision over [his] knee" had "closed." Also at that time, Zendler's right leg showed signs of lymphedema. During surgery, Wyoming Doctor made incisions on Zendler's right knee to introduce tools "into the knee joint to break apart adhesions from the initial surgery." Wyoming Doctor also injected steroids into Zendler's knee joint during surgery, and again in his office after surgery.

¶12 In January 2016, Zendler returned to Wyoming Doctor with "a loss in his range of motion, swelling in his operative knee, lymphedema that was not well controlled, and a mild fever." (Quotation simplified.) A culture was taken to test for infection; three days later, Wyoming Doctor informed Zendler "the culture came back positive for infection" (the second infection). On January 25, Wyoming Doctor performed a second surgery to remove Zendler's prothesis and to treat the second infection. The surgery was unsuccessful at eradicating the second infection, and in August 2016, after several additional

surgeries from providers at UCLA Medical Center, Zendler's right leg was amputated above the knee.

¶13    In November 2016, Plaintiffs filed a complaint against Defendants asserting three causes of action. Defendants filed a motion for summary judgment and a motion for partial summary judgment. After argument and supplemental briefing, the district court granted both of Defendants' motions. Plaintiffs timely appeal.

ISSUES AND STANDARD OF REVIEW

¶14    Plaintiffs argue the district court erred in dismissing their claim that Utah Doctor failed to obtain informed consent prior to performing surgery, as required by Utah's informed consent statute. They also argue the court erred in adopting Defendants' affirmative defense that Wyoming Doctor's treatment "was an intervening superseding cause of all of Plaintiffs' damages." "We review a district court's decision to grant summary judgment for correctness, granting no deference to the district court's conclusions." *Gillmor v. Summit County*, 2010 UT 69, ¶ 16, 246 P.3d 102 (quotation simplified).[3]

ANALYSIS

¶15    Rule 56 of the Utah Rules of Civil Procedure provides that summary judgment is appropriate "if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R.

---

3. Plaintiffs also argue the district court erred in dismissing their medical negligence claim. Because we affirm the court's rulings on the first two issues, this claim necessarily fails and accordingly we do not address it.

Civ. P. 56(a). Under this rule, "the extent of the moving party's burden varies depending on who bears the burden of persuasion at trial." *Salo v. Tyler*, 2018 UT 7, ¶ 26, 417 P.3d 581. "Where the moving party would bear the burden of proof at trial, the movant must establish each element of his claim in order to show that he is entitled to judgment as a matter of law." *Orvis v. Johnson*, 2008 UT 2, ¶ 10, 177 P.3d 600. But when the movant seeks summary judgment on a claim where the burden of production falls on the nonmoving party, "the moving party may carry its burden of persuasion without putting on any evidence of its own—by showing that the nonmoving party has no evidence to support an essential element of a claim." *Salo*, 2018 UT 7, ¶ 2.

## I. Causation

¶16    Plaintiffs argue the district court erred in adopting Defendants' affirmative defense that Wyoming Doctor's care of Zendler was a superseding cause of the injury. First, Plaintiffs contend Utah Doctor, not Wyoming Doctor, caused Zendler's prosthetic infection. According to Plaintiffs, the infection that arose after Utah Doctor performed the first surgery never resolved but instead remained indolent, meaning the first infection remained present but dormant. Second, they contend that even if Wyoming Doctor's subsequent care was a cause of the injury, it was not sufficient to break any causal chain.

¶17    To succeed on a medical malpractice claim, "the plaintiff must establish that the physician performed below the applicable standard of care, proximately causing injury to the plaintiff." *Pete v. Youngblood*, 2006 UT App 303, ¶ 20, 141 P.3d 629; *see also Ruiz v. Killebrew*, 2020 UT 6, ¶ 9, 459 P.3d 1005. "Proximate causation is that cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the result would not have occurred." *Kilpatrick v. Wiley, Rein & Fielding*, 909 P.2d

1283, 1292 (Utah Ct. App. 1996) (quotation simplified). "An intervening cause is an independent event, not reasonably foreseeable, that completely breaks the connection between fault and damages." *Breton v. Clyde Snow & Sessions*, 2013 UT App 65, ¶ 9, 299 P.3d 13 (quotation simplified).

¶18    Because the question of causation raises an issue of fact, it is generally reserved for the jury. *Steffensen v. Smith's Mgmt. Corp.*, 820 P.2d 482, 486 (Utah Ct. App. 1991). But a district court may decide an issue of proximate cause as a matter of law where "reasonable minds could not differ that something was or was not the proximate cause of injury." *Jensen v. Mountain States Tel. & Tel. Co.*, 611 P.2d 363, 365 n.4 (Utah 1980).

¶19    Here, Defendants argued as an affirmative defense that Wyoming Doctor's actions broke the chain of causation between Utah Doctor's alleged negligent care and the injury. Defendants' affirmative defense hinged on the propositions that (1) Zendler's infection had resolved prior to Wyoming Doctor's involvement, and (2) Wyoming Doctor's intervention caused a "second infection" that would not have occurred without his actions. Plaintiffs posit they presented evidence to the contrary on both points, which the district court did not exclude or otherwise find inadmissible but instead improperly weighed and used to make factual findings. We disagree.

¶20    First, Wyoming Doctor and experts on both sides agreed that at the time Wyoming Doctor intervened, Zendler's infection was under control, there were no obvious signs of infection, and the wound was healing. In August 2015, after his hospital stay to treat the first infection, Zendler reported to Wyoming Doctor he was not experiencing fevers, chills, or sweats; his pain was minimal; and he had returned to work parttime. The following month, Wyoming Doctor noted improvement of Zendler's incision and lymphedema, and observed that Zendler "looks better . . . than he has for quite some time since the onset of his

infection." Most importantly, after stopping Zendler's antibiotics, Wyoming Doctor took two cultures from Zendler's knee in October and November 2015. Each was negative for infection, leading Wyoming Doctor to conclude, on December 3, 2015, that the wound "is closed" and "the infection has resolved."

¶21 Second, Wyoming Doctor broke the causation sequence when he stopped Zendler's antibiotics, performed surgery on him, and injected immunosuppressant steroids into his knee. It is undisputed that following the first infection, near the end of June 2015, a team of orthopedic and infectious disease specialists, in consultation with Utah Doctor, instructed Zendler to complete a six-month course of antibiotics. But three months later, Wyoming Doctor, who is not an infectious disease specialist, intervened and stopped the antibiotics months before the prescribed course was complete. Wyoming Doctor then performed surgery on the recently healed knee. During surgery, and again in his office, Wyoming Doctor injected steroids into Zendler's knee joint.

¶22 Based on expert testimony from both sides, we agree that each of these actions was a separate efficient intervening cause of the injury. First, Wyoming Doctor's decision to prematurely stop Zendler's antibiotics was not reasonably foreseeable. One infectious disease specialist observed that while the antibiotic prescribed to Zendler has a normal success rate of "85 to 90 percent," "if you stop that antibiotic prematurely, you increase the odds of failure." And Plaintiffs' expert testified he would not have stopped Zendler's antibiotics without consulting with the prescribing doctor, stating, "I literally have never unilaterally stopped a treatment without some sort of input from the person that owned the treatment . . . ."

¶23 Second, experts on both sides agreed that a post-surgical infection from a knee replacement is serious and it is not easy to

determine whether such an infection has resolved or merely become indolent. Not only does performing surgery on a recently infected knee present a higher risk of new infection, but in this case, there was the additional risk associated with the lymphedema present in Zendler's operative leg at the time of the second surgery. In addition, the second surgery carried with it the risk of disturbing the first infection that may have been indolent. In light of such widely recognized risks, it was not reasonably foreseeable that Wyoming Doctor would perform the second surgery.

¶24 Lastly, Wyoming Doctor's act of injecting steroids into Zendler's knee was not reasonably foreseeable. Experts on both sides testified about the impact of steroids on a patient's ability to fight infections. Each expert acknowledged a link between steroids and infection. Wyoming Doctor agreed with the consensus, testifying that injecting steroids into an infected knee "could exacerbate an infection."

¶25 Based on the foregoing, the district court correctly ruled that Defendants had established their affirmative defense as a matter of law. Testimony from experts on both sides indicated Wyoming Doctor's treatment was a superseding cause of the injury because his decisions to stop Zendler's antibiotics, perform elective surgery on him, and inject him with steroids were independent events, not reasonably foreseeable, that effectively broke the causal connection between Utah Doctor's actions and Zendler's eventual amputation. *See Breton*, 2013 UT App 65, ¶ 9.

## II. Informed Consent

¶26 Plaintiffs next argue the district court erred in dismissing their informed consent claim by misapplying Utah's informed consent statute. They contend the statute "requires that physicians inform each patient of his or her specific increased risks" before performing surgery and assert Utah Doctor did not

fulfill this obligation because he gave Zendler "the same information as to potential bad outcomes that he gives to every surgery patient." Defendants counter that Plaintiffs' interpretation expands the scope of the informed consent statute beyond its plain language and urge us to affirm the court's determination that the disclosures provided by Utah Doctor satisfied the plain language of the statute. We agree with Defendants.

¶27   In Utah, claims for failure to obtain informed consent are governed by statute. *See* Utah Code Ann. § 78B-3-406 (LexisNexis Supp. 2019).[4] That statute provides,

> For a patient to recover damages from a health care provider in an action based upon the provider's failure to obtain informed consent, the patient must prove the following:
>
> . . . .
>
> (iv) the health care rendered carried with it a substantial and significant risk of causing the patient serious harm;
>
> (v) the patient was not informed of the substantial and significant risk;
>
> (vi) a reasonable, prudent person in the patient's position would not have consented to the health care rendered after having been fully informed as

---

4. Because the statutory provisions in effect at the relevant times do not differ materially from the statutory provisions now in effect, we cite the current version of the Utah Code for convenience.

> to all facts relevant to the decision to give
> consent . . . .

*Id.* § 78B-3-406(1)(b).

¶28   The district court concluded Utah Doctor met the statutory informed consent requirements based on the undisputed facts that "on at least three occasions" Utah Doctor conveyed to Zendler the potential risks specific to his surgery, including the risk of "infection requiring further surgery or removal of implants" and "massive infection requiring amputation." The court reasoned that "[w]hile there may be multiple factors that result in these risks being substantial and significant, the plain language of the informed consent statute does not require doctors to parse out each factor with their accompanying added percent-of-risk." Accordingly, Plaintiffs failed to establish the elements required to state a claim under Utah Code section 78B-3-406.

¶29   We discern no error in the district court's interpretation of the informed consent statute. When tasked with interpreting a statute, "we look first to the plain language of the statute." *Bagley v. Bagley*, 2016 UT 48, ¶ 10, 387 P.3d 1000 (quotation simplified). We "presume that the legislature used each word advisedly and give effect to each term according to its ordinary and accepted meaning." *State v. Richardson*, 2006 UT App 238, ¶ 13, 139 P.3d 278 (quotation simplified).

¶30   Under the plain language of the informed consent statute, a medical provider must inform the patient "of the substantial and significant risk[s]" of a procedure. Utah Code Ann. § 78B-3-406(1)(b). Here, it is undisputed Zendler was informed multiple times prior to surgery of the potential risks and benefits of the procedure. In December 2014, during Zendler's initial consultation with Utah Doctor, Utah Doctor informed Zendler that he "was a candidate for total knee replacement surgery on his right knee." Utah Doctor explained to Zendler that knee

replacement surgery "carries with it several significant and substantial risks, including (1) infection requiring further surgery or removal of implants; (2) massive infection requiring amputation; and (3) life-threatening complications including stroke, clot, heart attack, pulmonary embolism and death." (Quotation simplified.) Knowing these risks, Zendler elected to proceed with surgery. On the morning of surgery, Zendler and Utah Doctor again discussed the potential risks, including "infection requiring further surgery or removal of implants" and "massive infection requiring amputation." Following this discussion, Zendler "signed consent willfully" to proceed with surgery. The Hospital staff verified this consent a final time immediately before Zendler was taken to the operating room.

¶31 Nevertheless, Plaintiffs argue Utah Doctor's attempt to obtain informed consent was insufficient because Zendler was provided with only a list of "generic" risks, asserting "the law requires that a patient be informed of *his* specific risks, given his specific medical condition." Thus, they contend Utah Doctor "had a duty to inform [Zendler] that he faced not only a significantly higher risk of developing an infection than a typical patient due to his lymphedema, but that the consequences of such an infection would be much more severe." We disagree.

¶32 Plaintiffs' argument would expand the scope of Utah's informed consent statute beyond its plain language to include common law consent requirements. But our supreme court has recognized "the informed consent statute displaces all common law claims based on failure to inform a patient of the medical risks posed by a medical procedure." *Daniels v. Gamma West Brachytherapy, LLC*, 2009 UT 66, ¶ 46, 221 P.3d 256. And the disclosure requirements imposed by the statute are narrower than their common law counterparts. *Id.* ¶ 50. The statute requires health care providers to disclose only the risks of a health care treatment that are "substantial and significant and that could cause the patient serious harm," whereas "the

common law duty to disclose requires a physician to provide a patient with any information material to the decision process of an ordinary individual." *Id.* (quotation simplified).[5] Thus, Plaintiffs are not entitled to damages, because damages are available only for claims satisfying the elements prescribed in the informed consent statute, and the statute does not require health care providers to parse out the percentage or likelihood of each risk.

## CONCLUSION

¶33 The district court did not err in concluding Plaintiffs failed to establish causation. The court also did not err in dismissing Plaintiffs' informed consent claim, because Utah's informed consent statute does not require health care providers to inform each patient of his or her specific increased risks.

¶34 Affirmed.

—————

5. Indeed, Plaintiffs appear to conflate the disclosure requirements under the informed consent statute with those required under the common law. Plaintiffs cite *Nixdorf v. Hicken*, 612 P.2d 348 (Utah 1980), for the proposition that a doctor "must supply the patient with the material facts the patient will need in order to intelligently" make healthcare decisions. *Id.* at 354 nn. 18–19. But as our supreme court recognized in *Daniels v. Gamma West Brachytherapy, LLC*, 2009 UT 66, 221 P.3d 256, the disclosure requirements at issue in *Nixdorf* were imposed by the common law duty to disclose rather than by statutory duty. *See id.* ¶ 50.